[No. S127275. May 22, 2008.]

CHARLES KEITH RICHARDSON, Petitioner, v.
THE SUPERIOR COURT OF TULARE COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## Counsel

Richard Jay Moller and Karen Kelly, under appointments by the Supreme Court, for Petitioner.

No appearance for Respondent.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Louis M. Vasquez, Eric L. Christoffersen, Lloyd G. Carter and Kathleen A. McKenna, Deputy Attorneys General, for Real Party in Interest.

## Opinion

**MORENO, J.**—This writ proceeding is related to petitioner Charles Keith Richardson's automatic appeal from a judgment of death. (*People v. Richardson* (2008) 43 Cal.4th 959 [77 Cal.Rptr.3d 163, 183 P.3d 1146].) Here, we review the denial of petitioner's postconviction motion under Penal Code section 1405[1] for DNA testing of certain hair samples that were admitted at his capital trial.[2] Our review of the trial court's ruling turns upon the applicable standard of review and the interpretation of two key statutory phrases. We conclude that the applicable standard of review for rulings under section 1405 is abuse of discretion. Having so concluded, we further conclude that the trial court did not abuse its discretion when it denied petitioner's motion on the ground that he failed to demonstrate that "[t]he requested DNA testing results would raise a reasonable probability that, in light of all the evidence, [his] verdict or sentence

---

[1] All further unspecified statutory references are to the Penal Code.

[2] We take judicial notice of the record in the related appeal. (Evid. Code, § 452, subd. (d).)

would have been more favorable if the results of DNA testing had been available at the time of conviction." (§ 1405, subd. (f)(5).)

## I. STATEMENT OF THE CASE

On September 12, 1989, petitioner was charged in an amended information with one count of murder. (§ 187.) The victim was 11-year-old April Holley. The information further alleged felony-murder special circumstances for burglary, rape, sodomy and lewd and lascivious acts on a child under the age of 14. (§ 190.2, subd. (a)(12).) Petitioner was charged with residential burglary (§ 459) of the Holley residence and forcible rape (§ 261), lewd and lascivious acts on a child under 14 (§ 288, subd. (b)), and sodomy (§ 286, subd. (c)), all of these crimes also allegedly committed against April Holley. On April 11, 1992, petitioner was convicted by a jury of all counts, and all special circumstances were found to be true. On September 8, 1992, the jury returned a death verdict. The trial court declined to modify the verdict (§ 190.4, subd. (e)), and sentenced petitioner to death. Petitioner's conviction was automatically appealed to this court. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)[3] We affirmed the judgment and sentence in petitioner's appeal. (*People v. Richardson, supra,* 43 Cal.4th at p. 1039.)

As explained more fully in our opinion in the automatic appeal, the victim was found dead in the bathtub of the residence she shared with her mother and sister. Certain hair samples were recovered from debris in the bathtub and from the victim's clothing; some of these hairs were identified by prosecution experts as consistent with petitioner's hair. (*People v. Richardson, supra,* 43 Cal.4th at pp. 980–981.)

On May 24, 2004, petitioner filed a motion pursuant to section 1405 seeking DNA testing of four pubic hairs identified in his motion as exhibits 4-A, 16-A, 16-B, and 16-C, which were admitted at petitioner's trial. Two hair analysis experts had testified for the prosecution. One of them, Steven O'Clair, opined that exhibit 16-A, a pubic hair recovered from the debris in the bathtub where the victim was found, was consistent with petitioner's hair, as was exhibit 16-C, another pubic hair removed from the bathtub. O'Clair also testified that exhibit 4-A, a pubic hair from a towel stuffed into the bathtub drain, was consistent with petitioner's hair, as was exhibit 16-B, another pubic hair removed from the bathtub. The second prosecution expert, Charles Morton, agreed that exhibits 16-A and 16-C were consistent with petitioner's hair. Morton, however, disagreed with O'Clair's conclusion that

---

[3] To the extent it is necessary to refer to factual matters adduced at petitioner's trial, we cite the statement of facts in the related automatic appeal because it was this same evidence the trial court was required to examine in evaluating whether to grant petitioner's motion. (§ 1405, subd. (f)(5).)

exhibits 4-A and 16-B were also consistent with petitioner's hair. Morton testified that exhibits 4-A and 16-B were consistent with hair from the victim's mother. Petitioner presented his own hair experts, Stephan Schliebe and Peter Barnett, who disputed the conclusions of the prosecution experts. (*People v. Richardson, supra*, 43 Cal.4th at p. 981.)

In his motion for DNA testing of the hair, petitioner noted that a number of courts have approved the use of mitochondrial DNA (mtDNA) analysis on pubic hair. He contended that he was entitled to an analysis of the four hair samples at issue because the hairs were the only physical evidence connecting him to the crime. He argued that the testing would "raise a reasonable probability that [his] verdict or sentence would have been more favorable" had such testing been available at the time of his trial.

The prosecution argued that petitioner had failed to satisfy section 1405's requirements that the movant make a prima facie showing of the materiality of the evidence sought to be tested, and had also failed to meet the threshold for reasonable probability. (§ 1405, subd. (f)(4), (5).) The prosecution contended that the prima facie case of materiality had not been made because "[i]f the pubic hairs were tested and found not to have Petitioner's DNA, that fact alone does not prove Petitioner's innocence because of the vast array of other evidence linking him to the murder . . . . If DNA analysis reveals Petitioner as the DNA donor on the pubic hairs, it will further inculpate him. If DNA testing excludes Petitioner as a donor—the only other possibility—it will provide no new information." Similarly, the prosecution argued that the evidence supporting petitioner's conviction was such that, even if DNA testing revealed he was not the DNA donor of the pubic hairs, there was no reasonable probability that he would have obtained a more favorable result had the testing been available at the time of his trial.

At the hearing of petitioner's motion, the trial court agreed with the prosecution and denied the motion. Petitioner then filed the instant petition for writ of mandate or prohibition. We issued an order to show cause.

## II. ANALYSIS

### A. *Relevant Subdivisions of Section 1405*

For our purposes, the relevant subdivisions of section 1405 are subdivisions (a), (f), and (j). Subdivision (a) provides: "A person who was convicted of a felony and is currently serving a term of imprisonment may make a written motion before the trial court that entered the judgment of conviction in his or her case, for performance of forensic deoxyribonucleic acid (DNA) testing."

■ Section 1405, subdivision (f) directs the trial court to grant the motion for DNA testing if eight conditions are met. At issue are the fourth and fifth conditions. Subdivision (f)(4) provides: "The convicted person has made a prima facie showing that the evidence sought to be tested is material to the issue of the convicted person's identity as the perpetrator of, or accomplice to, the crime, special circumstance, or enhancement allegation that resulted in the conviction or sentence." Subdivision (f)(5) requires the moving party to establish that "[t]he requested DNA testing results would raise a reasonable probability that, in light of all the evidence, the convicted person's verdict or sentence would have been more favorable if the results of DNA testing had been available at the time of conviction. The court in its discretion may consider any evidence whether or not it was introduced at trial."

Section 1405, subdivision (j) authorizes appellate review of the order granting or denying the motion exclusively through a "petition for writ of mandate or prohibition filed by the person seeking DNA testing, the district attorney, or the Attorney General. . . . In a noncapital case, the petition for writ of mandate or prohibition shall be filed in the court of appeal. In a capital case, the petition shall be filed in the California Supreme Court."

Our disposition of this matter turns upon the meaning of these subdivisions. As to section 1405, subdivision (j), we must determine the applicable standard of review of the trial court's ruling on a motion for DNA testing. We must also determine the meaning of the materiality requirement in subdivision (f)(4) and what constitutes a "reasonable probability" for purposes of subdivision (f)(5) of section 1405.

### B. *The Standard of Review*

The People argue that the correct standard of review in this case is for abuse of discretion while petitioner contends that the trial court's ruling should be reviewed for substantial evidence. The two cases cited by petitioner in support of his claim, however, involve statutes very different from section 1405; in each of those cases, evidence was presented to the trial court that the petitioner subsequently attacked in a writ proceeding as insufficient to support the trial court's ruling. (*Murray v. Superior Court* (1955) 44 Cal.2d 611, 618 [284 P.2d 1] [review of affidavit in support of civil arrest]; *Sheard v. Superior Court* (1974) 40 Cal.App.3d 207, 210–211 [114 Cal.Rptr. 743] [review of affidavits in support of motion to quash summons].) These opinions do not, therefore, support petitioner's claim that substantial evidence is the applicable standard of review for denial of a motion under section 1405.[4]

---

[4] In any event, petitioner is wrong if he believes that the substantial evidence standard of review is more favorable to his arguments. Under that well-established standard, the reviewing court "will not disturb the implied findings of fact made by a trial court in support of an

■ What the statute requires us to review is whether the trial court correctly determined petitioner failed to establish that, "in light of all the [trial] evidence," the "requested DNA testing results would raise a reasonable probability that . . . [petitioner's] verdict or sentence would have been more favorable if the results of DNA testing had been available at the time of conviction." (§ 1405, subd. (f)(5).) Because this determination is necessarily based upon the trial court's judgment—that is, its evaluation of the weight of trial evidence in relation to DNA testing presumably favorable to petitioner— its decision is a discretionary, rather than a ministerial, one. (See *Rodriguez v. Solis* (1991) 1 Cal.App.4th 495, 501–502 [2 Cal.Rptr.2d 50] ["A ministerial act is an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists. Discretion, on the other hand, is the power conferred on public functionaries to act officially according to the dictates of their own judgment."].) We conclude therefore that the standard of review of a trial court's ruling on a section 1405 motion is abuse of discretion.

■ Our conclusion is supported by the apparent intent of the Legislature in enacting section 1405, as revealed by the legislative history, which was to provide defendants with a narrowly circumscribed opportunity to develop new evidence in preparation for a new trial motion based on newly discovered evidence. (Sen. Bill No. 1342 (1999–2000 Reg. Sess.).) Not only does the purpose of section 1405 directly relate to new trial motions on this ground, but it is also analogous to section 1181, subdivision 8, which authorizes such new trials where new evidence has been discovered. There, as here, the moving party must fulfill certain preconditions to warrant a new trial on this ground, including showing that the newly discovered evidence is material and is " ' "such as to render a different result probable on a retrial of the cause . . . ." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328 [19 Cal.Rptr.2d 529, 851 P.2d 811].) It is settled law that the standard of review for an order denying a new trial motion based on newly discovered evidence is abuse of discretion. (*Ibid.*)

"Although mandamus does not generally lie to control the exercise of judicial discretion, the writ will issue 'where, under the facts, that discretion can be exercised in only one way.' [Citations.]" (*Robbins v. Superior Court* (1985) 38 Cal.3d 199, 205 [211 Cal.Rptr. 398, 695 P.2d 695].) "Mandate lies

order . . . [and] [¶] [w]hen the evidence is conflicting, it will be presumed that the court found every fact necessary to support its order that the evidence would justify. [¶] So far as it has passed on the weight of the evidence, its implied findings are conclusive." (*Murray v. Superior Court, supra,* 44 Cal.2d at p. 619.) We note, finally, that while petitioner advocates the substantial evidence standard of review, his presentation of the evidence violates that standard because he presents the evidence in the light most favorable to his claim rather than to the trial court's order.

to control judicial discretion when that discretion has been abused. [Citations.]" (*State Farm etc. Ins. Co. v. Superior Court* (1956) 47 Cal.2d 428, 432 [304 P.2d 13].) "A trial court will be found to have abused its discretion only when it has ' "exceeded the bounds of reason or contravened the uncontradicted evidence." ' [Citations.]" (*IT Corp. v. County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121].) Moreover, in a mandamus proceeding, in assessing whether the trial court abused its discretion the "judgment or order of the lower court is presumed correct . . . ." (*Ace Beverage Co. v. Municipal Court* (1993) 16 Cal.App.4th 703, 708 [20 Cal.Rptr.2d 153], fn. omitted.)

### C. *"Materiality" and "Reasonable Probability"*

As noted, the trial court agreed with the prosecution that the results of DNA testing were not material and that, in any event, there was no reasonable probability that petitioner would have obtained a more favorable result in light of all the evidence adduced at trial against him, even assuming the testing showed the hairs in question were not his. In order to evaluate whether the trial court abused its discretion, we must first interpret the meaning of the materiality requirement in section 1405, subdivision (f)(4) and the reasonable probability standard in section 1405, subdivision (f)(5).

██ "It is the duty of this court in construing a statute to ascertain and give effect to the intent of the Legislature." (*People v. Freeman* (1988) 46 Cal.3d 419, 425 [250 Cal.Rptr. 598, 758 P.2d 1128].) "To determine the meaning of a statute, we seek to discern the sense of its language, in full context, in light of its purpose." (*People v. Cooper* (2002) 27 Cal.4th 38, 45 [115 Cal.Rptr.2d 219, 37 P.3d 403].)

Section 1405, subdivision (f)(4) requires the moving defendant to make "a prima facie showing that the evidence sought to be tested is material to the issue of the convicted person's identity as the perpetrator of . . . the crime . . . ." The statute does not define materiality. In other, analogous, criminal law contexts—those in which the defendant seeks to obtain information or contends that information to which the defendant was entitled was withheld—the test for materiality can impose a greater or lesser burden. For example, a defendant who seeks the production of personnel records of police officers that might disclose complaints against the officers for excessive force or other conduct potentially relevant to the defense must submit affidavits showing good cause for the discovery and "setting forth the materiality thereof to the subject matter involved in the pending litigation . . . ." (Evid. Code, § 1043, subd. (b)(3); see *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 536–537 [113 Cal.Rptr. 897, 522 P.2d 305] (*Pitchess*).) The materiality standard is met if evidence of prior complaints is admissible or may lead to

admissible evidence. (*People v. Memro* (1985) 38 Cal.3d 658, 683 [214 Cal.Rptr. 832, 700 P.2d 446].)

In contrast to this low threshold of *Pitchess* materiality is the showing required of a defendant who contends that the prosecution withheld evidence that was both favorable to the defendant and material either on the issue of guilt or punishment. (*Brady v. Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 83 S.Ct. 1194] (*Brady*).) "Evidence is material under the *Brady* standard 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 7–8 [124 Cal.Rptr.2d 202, 52 P.3d 129].)

■ Because, as in the *Pitchess* context, the materiality requirement in section 1405, subdivision (f)(4) relates to the discovery of evidence, it too requires a lesser showing of materiality by a defendant than, for example, in the *Brady* context, where the claim involves a species of prosecutorial misconduct and asserts a due process violation. This conclusion is buttressed by the fact that only a prima facie showing of materiality is required by section 1405. We conclude, therefore, that the moving defendant is required only to demonstrate that the DNA testing he or she seeks would be relevant to the issue of identity, rather than dispositive of it. That is, the defendant is not required to show a favorable test would conclusively establish his or her innocence. It would be sufficient for the defendant to show that the identity of the perpetrator of, or accomplice to, the crime was a controverted issue as to which the results of DNA testing would be relevant evidence.

This reading of section 1405, subdivision (f)(4) is supported by the legislative history of section 1405. The analysis for Senate Bill No. 1342 notes that the Attorney General preferred "that the standard for testing should be that it is dispositive, not merely . . . relevant, on the question of innocence. The author believes that this proposed standard is too narrow and in those cases where it is not dispositive of the evidence a court can decide its relevancy." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1342 (1999–2000 Reg. Sess.) as amended Mar. 30, 2000, p. 13.)

■ However, a prima facie showing of materiality does not, by itself, require the trial court to grant the motion for DNA testing. Once this showing has been made, section 1405, subdivision (f)(5) directs the trial court to further assess whether, "in light of all the evidence," the DNA results would

raise "a reasonable probability that . . . the convicted person's verdict or sentence would have been more favorable if the results of DNA testing had been available at the time of conviction." We turn now to the meaning of the term "reasonable probability" in this context.

■ " 'Generally, "[w]here the language of a statute uses terms that have been judicially construed, ' "the presumption is almost irresistible" ' that the terms have been used ' "in the precise and technical sense which had been placed upon them by the courts." ' " ' " (*People v. Lawrence* (2000) 24 Cal.4th 219, 231 [99 Cal.Rptr.2d 570, 6 P.3d 228].)

The parties agree that the term "reasonable probability" has been the subject of prior judicial construction in other contexts relevant to our analysis. Petitioner cites the use of the "reasonable probability" standard in connection with claims of ineffective assistance of counsel (*Strickland v. Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*)) and the assessment of prejudice for state law error (*People v. Watson* (1956) 46 Cal.2d 818 [299 P.2d 243] (*Watson*)). Under *Strickland*, a defendant asserting ineffective assistance of counsel must demonstrate "(1) that counsel's performance was deficient, i.e., that the representation fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been more favorable to defendant, i.e., a probability sufficient to undermine confidence in the outcome." (*In re Ross* (1995) 10 Cal.4th 184, 201 [40 Cal.Rptr.2d 544, 892 P.2d 1287].) Under the *Watson* standard, prejudicial error is shown where " ' "after an examination of the entire cause, including the evidence," [the reviewing court] is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.] 'We have made clear that a "probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' [Citation.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [16 Cal.Rptr.3d 374, 94 P.3d 513].)

■ We agree that in the context of section 1405, the term "reasonable probability" has the same meaning that it has in the *Strickland* and *Watson* contexts. Seizing upon part of the *Strickland* formulation—"a probability sufficient to undermine confidence in the outcome" (*Strickland, supra,* 466 U.S. at p. 694)—petitioner contends that the reasonable probability requirement can be satisfied by something less than showing a different, more favorable result. Not so. "[A] defendant cannot establish a constitutional violation simply by demonstrating that an alleged trial-related error could or might have affected the jury. To establish that ineffective assistance of counsel violates the Sixth Amendment, for example, a defendant must show a

'*reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' [Citation.]" (*Boyde v. California* (1990) 494 U.S. 370, 380–381, fn. 4 [108 L.Ed.2d 316, 110 S.Ct. 1190], italics added.) Therefore, to prevail on a section 1405 motion, the defendant must demonstrate that, had the DNA testing been available, in light of all of the evidence, there is a reasonable probability—that is, a reasonable chance and not merely an abstract possibility—that the defendant would have obtained a more favorable result.

In making this assessment, however, it is important for the trial court to bear in mind that the question before it is whether the defendant is entitled to develop potentially exculpatory evidence and not whether he or she is entitled to some form of ultimate relief such as the granting of a petition for habeas corpus based on that evidence. As the Ninth Circuit observed in an analogous decision, "Obtaining post-conviction access to evidence is not habeas relief." (*Osborne v. Dist. Atty's Office for Third Judicial* (9th Cir. 2008) 521 F.3d 1118, 1132 [defendant has limited due process right to semen and two hairs for postconviction DNA testing].) Therefore, the trial court does not, and should not, decide whether, assuming a DNA test result favorable to the defendant, that evidence in and of itself would ultimately require some form of relief from the conviction.

## D. *Application*

Applying the foregoing principles to the case before us, we agree with petitioner that he established that the DNA test would have been relevant to the issue of the identity of the perpetrator.

We further conclude that the trial court did not abuse its discretion when it denied petitioner's motion because it "believe[d] that there was a substantial amount of other evidence linking him to this crime," a statement which, in context, constitutes a finding that petitioner failed to establish the reasonable probability requirement. Petitioner emphasizes that the hair evidence was the only physical evidence linking him to the commission of the offenses against the victim. The trial court, however, found that this evidence was not "conclusive" on the issue of guilt and that the defense substantially weakened whatever value the hair evidence had through effective cross-examination of the prosecution's experts and use of its own experts. We cannot conclude that the trial court abused its discretion by so finding.

On the first point, as defense counsel himself noted during his argument at the hearing on his motion, the prosecution's two experts, O'Clair and Morton, could not even agree between themselves which of the pubic hairs was consistent with petitioner's hair. While O'Clair opined that four hairs, 4-A,

16-A, 16-B, and 16-C, were consistent with petitioner's hair, Morton agreed only as to exhibits 16-A and 16-C; in his opinion exhibits 4-A and 16-B were consistent with hair from the victim's mother. Even as the hair evidence was presented, then, it was clear that it was far from definitive and subject to quite different interpretations from equally qualified experts.

These points were driven home to the jury by effective cross-examination in which, as the trial court also noted, "the defense did a good job of downplaying the significance of hair evidence." For example, the defense got O'Clair to acknowledge that hair analysis involves "quite a bit of subjectivity"; that it was not the same as fingerprint analysis; and that it was not uncommon for experts to disagree. The prosecution's second expert, Morton, was also forced to acknowledge the limits of hair analysis on cross-examination when he testified that the most that could be said about a hair sample was that it was "consistent" with an individual's hair and "could be from that individual." He admitted he could not say that the hair samples belonged to defendant. He, like O'Clair, also conceded that hair analysis was a "subjective process" and two competent experts looking at the same sample could reach different conclusions.

In addition to effectively cross-examining the prosecution's hair analysis experts, the defense's two experts rejected the conclusion of the prosecution's experts. Stephan Schliebe testified that the squalid condition of the bathroom where the victim was murdered, and from which the hairs were collected, diluted their value. He also pointed out that hair could easily be transferred from one place to another. This latter observation was related to evidence that petitioner had been a sometime visitor to the victim's residence, the implication being that any hair identified as consistent with his could have been deposited during an earlier visit. Finally, contrary to the testimony of the prosecution's experts, Schliebe testified that none of the four hair exhibits in question, 4-A and 16-A through 16-C, were consistent with petitioner's hair. Additionally, a second defense forensic expert, Peter Barnett, also testified that the four samples were not consistent with petitioner's hair.

■ Petitioner emphasizes probability testimony by the prosecution's expert O'Clair based on a study referred to as the Gaudette study. According to O'Clair, this study indicated that the probability that pubic hair consistent with one individual could be matched to another individual was 1 in 800. Petitioner claims that the prosecutor mischaracterized this testimony to argue that the hair analysis was more conclusive than indicated by the experts' testimony.[5] As petitioner concedes, however, of the four experts, O'Clair was

---

[5] Petitioner also renews the claim he advanced in his automatic appeal that the admission of this testimony was error, and that the prosecutor's use of the study in closing argument was misconduct, and petitioner generally attacks the use of hair analysis evidence. This proceeding is not

alone in his reliance on the Gaudette study. Even the prosecution's other expert, Morton, dismissed its significance. The prosecutor's reference to this evidence was not improper and, as the jury was instructed, his argument was also not evidence. Moreover, the defense vigorously disputed the significance of hair evidence arguing that "the hair evidence in this case means absolutely nothing." Finally, section 1405 itself directs the trial court to examine the evidence, not the argument of counsel, in determining whether the moving party has made the required reasonable probability showing. We presume that the trial court did so and disregarded counsel's arguments.

In short, as the trial court observed, the hair evidence was, at most, simply one piece of evidence tending to show guilt and it was fiercely disputed by the defense to the point that it may well have had little significance in the jury's determination of guilt or sentence. By contrast, the evidence that petitioner was the perpetrator was strong. As we observed in petitioner's automatic appeal, this evidence included, in addition to the hair evidence, "defendant's statement to a witness evincing awareness that the victim, whom he knew, was alone on the night she was murdered; . . . defendant's statements in the immediate aftermath of the murder in which he either admitted killing the victim or revealed details about the murder that had not been released to the public; . . . defendant's flight from the scene the day after the murder; . . . defendant's shifting stories in statements he made to the police culminating in an admission—quickly retracted—that he had commit-ted the murder; . . . defendant's statement to a fellow inmate that he had murdered Holley; . . . [and] Steven Brown's subsequent attempt to commit a similar crime against another victim." (*People v. Richardson, supra*, 43 Cal.4th at p. 971.)[6]

 Petitioner attacks or minimizes the significance of each category of evidence. As we observed at the outset, however, our role is not to review the record of the trial de novo but to determine whether the trial court abused its discretion in denying the motion based on its assessment of the record.[7] We cannot find an abuse of discretion on the record before us. We believe that the reason the Legislature required convicted persons to bring section 1405

the proper vehicle in which to raise these claims, which are recycled from petitioner's appeal and which we have rejected there. We do not address them further here.

[6] The prosecutor argued that Brown's unsuccessful attempt to commit a similar crime—the rape and drowning of a female victim—tended to show a common plan and that the Holley murder had required two participants.

[7] Contrary to petitioner's suggestion, there is no requirement in section 1405 that the trial court make on-the-record findings to support its ruling. To the extent petitioner claims that the DNA testing should have been ordered because the results might be useful to him on habeas corpus or for purposes of executive clemency, we reject the claim. Section 1405 does not require the trial court to order DNA testing because it might be helpful in these contexts but only where the conditions of subdivision (f) are fulfilled.

motions before the judge who presided over their trials was precisely because the trial judge is in the best position to make the reasonable probability determination. Our own assessment of the evidence for purposes of the automatic appeal demonstrates to our satisfaction that the evidence against petitioner was compelling and supported both his conviction and the death sentence. We are not persuaded that the trial judge abused its discretion when, examining the same record, it determined that petitioner had failed to satisfy the reasonable probability requirement with respect to the jury's verdict.

We find no more convincing his argument that DNA evidence, if produced, might have caused at least one juror during the penalty phase to decline to vote for the death penalty. Here, the jurors learned at the penalty phase that, in addition to the brutal circumstances of the crimes of which they had just convicted him, petitioner had forcibly raped a 16-year-old girl in concert with two others; had, while in jail for that offense, forced a fellow inmate to perform sexual acts on him and others; and had committed battery on an eight-month-old infant by squeezing his scrotum so hard the infant had to be hospitalized. In light of this additional evidence, we are not persuaded that the trial court abused its discretion in impliedly finding it is not reasonably probable that the DNA evidence would have altered the outcome of the penalty phase.

## III. DISPOSITION

The order to show cause is discharged and the petition is denied.

Kennard, J., Baxter, J., Werdegar, J., and Corrigan, J., concurred.

**CHIN, J.,** Dissenting.—The majority's interpretation of Penal Code section 1405 (section 1405) is reasonable. I do not believe, however, that it is the interpretation the Legislature intended. Accordingly, I dissent.

Section 1405 provides a means for prison inmates convicted of a felony to move .in the trial court for and, on a proper showing, obtain forensic deoxyribonucleic acid (DNA) testing of physical evidence. (See § 1405, subd. (a).) The obvious purpose of this statute is to enable inmates to try to establish their innocence by use of modern, sometimes highly probative, DNA testing. To obtain the testing, the inmate must satisfy certain require-ments, including, as relevant to the issue before us, (1) that the evidence sought to be tested is "material" to the question of the inmate's identity as the culprit (or one of the culprits); and (2) that "[t]he requested DNA testing results would raise a reasonable probability that, in light of all the evidence,

the convicted person's verdict or sentence would have been more favorable if the results of DNA testing had been available at the time of conviction." (§ 1405, subd. (f)(4), (5).)

Four years ago, in May 2004, petitioner moved for DNA testing of four pubic hairs that were admitted as evidence at his trial. Although the evidence was disputed, the prosecution argued vigorously to the jury that the hairs belonged to defendant and, indeed, that the hairs constituted "very, very compelling evidence" of petitioner's guilt. After petitioner's motion was thoroughly litigated in the trial court, that court denied testing. In its ruling, however, it acknowledged that the hair evidence "was argued by the prosecutor and contested and a big issue was made of it."

After the trial court denied the testing, petitioner sought review by filing this writ proceeding. He followed the proper procedure to seek appellate review. (See § 1405, subd. (j).) In order to review the trial court's ruling meaningfully, we issued an order to show cause and made this matter a companion case to the automatic appeal of petitioner's death judgment. (See *People v. Richardson* (2008) 43 Cal.4th 959 [77 Cal.Rptr.3d 163, 183 P.3d 1146].) Doing so was necessary to enable this court to review the massive trial record, which, in turn, was necessary to determine whether to uphold or overturn the ruling denying testing. The parties then filed a return to the order to show cause and a reply to that return. The question has been argued in this court. In today's opinions—both in the automatic appeal and in this writ proceeding—the majority does a commendable job of analyzing all the relevant evidence and marshaling the facts in order to review the trial court's ruling. For the reasons the majority states, I agree that, viewed in isolation, it is unlikely that hypothetical results of the hypothetical testing of the pubic hairs could raise a reasonable probability that the result would have been more favorable to petitioner had the results been available at trial.

The problem is that all of this litigation, both in the trial court and in this court, all of this effort, by the parties and this court, all of this analysis and examination of a massive record, has been done solely to determine whether the hairs should be tested. This four-year effort has undoubtedly been far more expensive—in terms of monetary costs, passage of time, and expenditure of judicial resources—than if the hairs simply had been tested four years ago. If the trial court had ordered the testing, or the parties had simply agreed to it, then the results would long since have been known. If the testing confirmed that the hairs, or some of them, were defendant's, it would provide additional evidence of his guilt, and any doubts on this point would have been laid to rest. If the testing showed that the hairs belonged to one of the other possible suspects, or possibly an unknown person or persons, then the parties and judiciary could consider the significance of concrete results of

actual testing rather than making abstract decisions regarding hypothetical results of hypothetical testing.

Moreover, today's opinion is not necessarily the end of the road. As I noted, *viewing the hair evidence in isolation*, it appears petitioner failed to satisfy a rigorously applied reasonable probability test. But the hair evidence need not always be viewed in isolation. Hypothetically, petitioner might be able to generate other evidence in the future that casts doubt on his guilt or weakens the significance of other prosecution evidence. It is possible that hypothetical favorable results of the requested DNA evidence, in combination with other facts that may be developed in the future, could satisfy the reasonable probability test. If that were to occur, I suspect petitioner would be allowed to renew his request for the testing.

I find it hard to believe that, in enacting section 1405, the Legislature intended to create a process by which deciding whether to order DNA testing will often, perhaps routinely, be more expensive than the testing itself. I believe instead that in creating the materiality and reasonable probability requirements of section 1405, subdivision (f)(4) and (5), the Legislature intended to create a relatively straightforward and reasonably objective method of determining whether to order DNA testing without requiring testing in *all* circumstances. The difficulty in this case, I recognize, lies in the precise language of section 1405, subdivision (f)(5). Read literally, as the majority does, the statute does seem to require all of the hypothetical judgments and the thorough analysis the trial court and the majority have undertaken. But the statute does not compel a literal interpretation. "In general, it is settled that the language of a statute should not be given a literal meaning if doing so would result in absurd consequences that the Legislature did not intend. To this extent, therefore, intent prevails over the letter of the law and the letter will be read in accordance with the spirit of the enactment." (*In re Michele D.* (2002) 29 Cal.4th 600, 606 [128 Cal.Rptr.2d 92, 59 P.3d 164].)

The Legislature certainly did not intend to require DNA testing routinely in all cases. This is understandable and explains the purpose behind the materiality and reasonable probability requirements. But I also believe the Legislature did not intend to make litigation over whether to conduct testing more time consuming and costly than the testing itself. It must have intended courts to interpret the reasonable probability test in a way that avoids such an absurd result. We should interpret section 1405 in context. As the majority correctly notes (maj. opn., *ante*, at p. 1051), that section does not involve a determination whether to grant relief on some hypothetical habeas corpus petition after testing, which *would* require rigorous examination of all the evidence and all

the relevant facts, but merely whether to order testing in the first place. Section 1405, subdivision (f)(5)'s reasonable probability test should be interpreted with this in mind.

I would interpret section 1405 to require only a *preliminary* assessment of whether testing results would raise a reasonable probability of a different outcome. The trial court and, ultimately, a reviewing court, should base this preliminary assessment on the evidence and arguments set forth in the motion for testing and any opposition, and should not be obligated to review the entire trial record and reach a definite conclusion regarding the ultimate issue whether hypothetical test results would establish the petitioner's innocence. When, as here, the evidence was presented at trial, this preliminary assessment would be satisfied if the evidence sought to be tested played a significant role at trial, and the testing results could potentially contradict the prosecution theory at trial regarding that evidence. This would normally be an easy ruling to make and to review for abuse of discretion. Ordering the testing in this situation would be consistent with the legislative intent not to permit testing routinely but only when the evidence was truly important to the outcome. It would also at least minimize the occasions in which determining whether to order testing is more expensive and time consuming than the testing itself.

In this case, the hairs sought to be tested were admitted at trial. The prosecution theory was that the hairs belonged to petitioner and, indeed, that they provided compelling evidence of his guilt. As the trial court acknowledged, the evidence played a prominent role at trial. This should have been enough to satisfy the requirements of section 1405, subdivision (f)(4) and (5). No one disputes that the remaining requirements of that statute have been satisfied; accordingly, the trial court should have ordered the testing.

Because we are interpreting a statute, the Legislature can always change it. If it did not intend to erect as high a barrier to DNA testing as the majority demonstrates it erected, it can, and should, amend the statute. It might, for example, simply state that the materiality and reasonable probability requirements are satisfied (1) if the evidence sought to be tested was admitted and played a significant role at trial, and the testing results could potentially contradict the prosecution theory at trial regarding that evidence; or (2) if the evidence sought to be tested was not admitted at trial but the trial court concludes the evidence would have played a significant role at trial if it had been admitted, and the testing results could potentially provide significant evidence exonerating defendant.

For these reasons, I would grant the relief petitioner seeks and order the hairs to be subjected to DNA testing to determine whether they were, in fact, defendant's and, if not, whose they might have been.

George, C. J., concurred.

Petitioner's petition for a rehearing was denied July 16, 2008, and the opinion was modified to read as printed above. Chin, J., was of the opinion that the petition should be granted.