Filed 4/17/23  P. v. Zalloum CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E078029 |
| v. | (Super.Ct.No. INF1702079) |
| KHALED MOHD ZALLOUM, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Matthew Perantoni, Judge.  Affirmed in part; reversed in part with directions.

Christopher Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, Christine Y. Friedman and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury convicted Khaled Mohd Zalloum of one misdemeanor count of corporal injury resulting in a traumatic condition on a former cohabitant or dating partner (Pen. Code, § 273.5, subd. (a)) and one misdemeanor count of violating a domestic violence protective order (Pen. Code, § 166, subd. (c)(1); undesignated statutory references are to this code). Zalloum argues that the trial court prejudicially erred by (1) not instructing the jury on the defense of necessity as to the protective order count and (2) excluding testimony about a civil lawsuit the victim brought against him. We agree about the instructional error and reverse the conviction for violating the protective order. We otherwise affirm.

BACKGROUND

A. *The Relationship and the Criminal Charges*

In 2014, Zalloum met Jane Doe. They had an on-and-off romantic relationship from 2014 through 2018.

In 2020, the People charged Zalloum with several offenses arising from incidents involving Doe that occurred in June and October 2017. (All date references are to 2017 unless otherwise specified.) The information alleged that Zalloum had committed two violations of section 273.5, subdivision (a)—one a misdemeanor on June 7 and one a felony on October 5—by willfully inflicting corporal injury resulting in a traumatic condition on Doe. It was further alleged that on October 5 Zalloum willfully violated a protective order in violation of section 166, subdivision (c)(1) (section 166(c)(1)).

Both Doe and Zalloum testified at trial. They agreed that their relationship had been toxic. Doe testified that over the years Zalloum physically abused her about 30 to 50 times. She described a couple of incidents in which Zalloum used physical force against her. Zalloum denied that he had ever twisted Doe's neck or hit, kicked, beaten, or choked her.

B. *June 7 Incident*

On June 7, Doe and Zalloum were broken up and not living together. Doe had previously lived with Zalloum in his apartment in Palm Desert, California. While she lived there, Doe became friends with Sara M., one of Zalloum's neighbor's. On the night of June 6, Sara, Doe, and another friend of Doe's went to a nightclub. Around 2:00 a.m. the next morning, the three women and two men they had met at the club drove to the parking lot of Sara's apartment complex. The group stood around the parking lot talking.

Zalloum came downstairs from his second floor apartment and started fighting with one or both of the men. Zalloum got into Doe's car and, according to Doe, "called the cops because he was scared for his car." A law enforcement officer arrived and told everyone who lived at the apartment complex to go back to their apartments and everyone else to leave.

Doe walked Zalloum to his apartment. When they arrived at the door to the apartment, Zalloum pushed Doe and told her to get inside the apartment. When inside, Zalloum pushed Doe onto the couch and would not allow her to leave, though she made several attempts. He stood in front of the door. Zalloum ripped off Doe's dress and

3

necklace. Zalloum grabbed Doe with one hand and choked her against a wall for about 20 to 30 seconds while Doe stood on her tiptoes. Doe felt numb and had difficulty breathing. Doe weighed 130 pounds, and she estimated that Zalloum weighed 190 to 210 pounds.

Doe ran into Zalloum's bedroom, banged on a wall shared with Sara's apartment next door, and screamed for Sara. Zalloum followed Doe into the bedroom and told her to be quiet. Zalloum grabbed Doe, pushed her onto the bed, and started hitting her body with one of his shoes. Doe put her hands and forearms up to try to protect herself from being hit by the shoe. Doe stopped screaming because she was afraid of Zalloum.

Sara woke up hearing Doe screaming Sara's name. Sara was concerned and believed that Doe might be in danger. Sara went to Zalloum's front door and knocked, but no one answered. Sara texted Zalloum at around 4:30 a.m. and asked if he and Doe could "'please just go to sleep.'" Around the same time, a neighbor who lived below Zalloum called 911 and reported that he could hear thumping from the neighbors above him, who were also being "verbal."

Zalloum choked Doe a second time, causing Doe to become "dizzy" and "very foggy" and "see[] stars." Doe feared for her life. Doe said that she then heard the police banging on the window and demanding to be let in.

Law enforcement officers arrived at the apartment around 4:30 or 4:40 a.m. From the apartment complex's parking lot across the courtyard, the officers could hear "yelling and screaming" from both a female and a male voice from somewhere in the complex.

4

One of the officers described what he heard as an "extremely verbal altercation." That officer also heard "thumping-type noises" and thus believed there "was possibly a physical altercation as well." The officers could not discern what was being said, but it sounded "violent" and like someone might be "in danger." The officers were able to determine that the noises were coming from Zalloum's apartment.

As the officers got closer to Zalloum's apartment, one of the officers heard a female voice repeatedly yelling, "'Get off of me,'" and "'Let me go.'" The officers knocked on the door. There was no response. The arguing continued. The officers knocked louder and announced their presence, demanding that the door be opened. A female voice continued to yell, "'Get off me,'" and "'Let me go.'"

Doe opened the door. She ran outside wearing only underwear. She was crying and hysterical. A female officer spoke to Doe. Another officer spoke with Zalloum. Sara was outside when Doe ran out. Doe told Sara that Zalloum had not allowed her to answer the door when Sara knocked.

A recording of the officer's interview of Doe was played for the jury. While they talked, Doe held a bag of ice on her face. According to the officer interviewing Doe, Doe was crying and distraught and appeared frightened. Doe reported to the officer that Zalloum had ripped off her clothes, thrown her on the bed, the couch, and the floor, "choked [her] out," and hit her in the head. Doe said that Zalloum had been "physical with" her that night approximately 10 to 14 times. Doe had "blacked out for a minute." She said that her head and eye were numb and that everything was "all blurry."

5

Officers found a torn dress and a broken bracelet in the apartment. Zalloum had redness on his knuckles. Officers arrested Zalloum.

The interviewing officer took a couple of photographs of Doe. The officer noticed redness on the back and front of Doe's neck along her jawline, which the other officer also noticed. The injuries were consistent with Doe's having been choked. Doe's eyes appeared red and swollen, and her forearms were red. That afternoon, Doe went to the police station to allow officers to photograph bruises that had developed on her forearms. An officer confirmed that "sometimes bruises show up later."

Zalloum claimed that Doe had fabricated the entire incident. He admitted that he went downstairs into the parking lot when Doe and Sara were down there with others and that he pushed one of the men. Zalloum eventually went upstairs with Doe, though he did not expect her to stay with him that night. Zalloum did not tell her to go inside his apartment. When they were inside his apartment, he sat on the couch. Doe was "hysterically crying," but Zalloum did not know why.

Before law enforcement arrived, Zalloum tried to go to sleep on the couch. He had offered Doe the bed, but she did not go to sleep. Doe attempted to have sex with him twice. Doe climbed on top of Zalloum while he was on the couch. Zalloum pushed Doe off, which she did not like. She cried and sobbed hysterically. Doe's dress was torn because she aggressively took it off herself when she tried to have sex with Zalloum.

Zalloum denied that he punched or choked Doe or beat her with a shoe. When law enforcement knocked on the door, Zalloum asked Doe to put clothes on, and she started

6

saying, "'Let me go. Let me go.'" Zalloum moved away and opened the door. Zalloum did not recall Doe knocking on the wall to Sara's apartment. He claimed that Sara was "probably" lying about hearing Doe scream for her that night because Zalloum did not hear that. Zalloum admitted that he did not believe the officers who heard screaming from across the courtyard made up what they heard.

C. *October 5 Incident*

After the June 7 incident, a court issued a three-year restraining order against Zalloum, prohibiting him from having any contact with Doe, communicating with her, or being within 100 yards of her. The order was filed on July 20 and expired on July 20, 2020. Zalloum was served with the protective order. Despite the protective order, Zalloum and Doe remained in contact and continued to have a sexual relationship.

On October 5, law enforcement responded to a call concerning a possible violation of the order. Doe testified that Zalloum invited her to his house on October 4, so she went there and stayed the night. At some point on October 5, Zalloum locked her out of the house after pushing her through a sliding glass door onto the balcony. Doe did not have her cell phone or the keys to her car or house. Doe banged on the sliding glass door and yelled for Zalloum to let her back inside. Doe said she was "hysterical."

Zalloum eventually let Doe back inside. Zalloum punched Doe in the ear and put her into "a head hold," which hurt her neck.

Zalloum's testimony about what happened on October 5 differed from Doe's. He testified that midmorning on October 5 he was awakened by Doe knocking or banging on

7

his bedroom window and calling his name. Doe also was banging on the sliding glass door of the living room. She was yelling and crying. Zalloum described Doe as "being hysterical." Zalloum repeatedly told Doe that he could not be around her because of the protective order. Zalloum did not call the police. He instead opened the door because he "was scared [Doe] actually—to go through the glass door." He reiterated that he let her inside because he "didn't want her to go through . . . the slider." He was concerned about Doe. He explained: "The way she was banging, I would rather violate the restraining order than see her come through the glass and hurt herself."

Zalloum asked Doe to calm down, but she would not. Doe jumped on Zalloum's back and bit him on the back and the neck. After Zalloum got Doe off of his back, he went into the bathroom and immediately started recording on his phone. The recording was played for the jury. Screenshots from the recording show the bite marks on Zalloum's neck. In closing argument, the People conceded that there was "definitely a bite mark on [Zalloum's] head." Doe claimed that the bite mark on Zalloum's head or neck was the result of a sexual encounter the previous night. Zalloum denied punching Doe in the ear or hitting her in the ear "on purpose."

D. *Defense Closing Argument and Verdict*

In closing argument, defense counsel acknowledged that the relationship between Zalloum and Doe was "very toxic" and that Doe appeared to be troubled, in pain, and suffering. Defense counsel argued, however, that "her allegations of physical violence [were] completely unreliable." Defense counsel pointed out that Doe had made a

8

"barrage" of inconsistent statements and that her hostile demeanor when confronted about the inconsistencies demonstrated that she was "unreliable" and "not telling the truth." Counsel pointed out the many inconsistencies in Doe's testimony and encouraged the jury "to disregard all of [Doe's] testimony, because it could not be believed." The prosecutor argued that Zalloum had lied.

The jury found Zalloum guilty of the misdemeanor infliction of corporal injury count arising from the June 7 incident and of violating a domestic violence protective order on October 5. The jury was unable to reach a verdict on the felony infliction of corporal injury count arising from the October 5 incident, so the court declared a mistrial on that count.

DISCUSSION

A. *Instructional Error—Defense of Necessity*

Zalloum requested that the trial court instruct the jury on the defense of necessity in CALCRIM No. 3403. He contends that the trial court prejudicially erred by denying the request. We agree.

A trial court must instruct the jury "on any affirmative defense for which the record contains substantial evidence [citation]—evidence sufficient for a reasonable jury to find in favor of the defendant [citation]—unless the defense is inconsistent with the defendant's theory of the case [citation]. In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the

9

jury, was sufficient to raise a reasonable doubt.'" (*People v. Salas* (2006) 37 Cal.4th 967, 982 (*Salas*).) In other words, substantial evidence in this context means "'evidence which is "sufficient to 'deserve consideration by the jury, i.e., "evidence from which a jury composed of reasonable [people] could have concluded"' that the particular facts underlying the instruction did exist."'" (*People v. Lemus* (1988) 203 Cal.App.3d 470, 477 (*Lemus*).) Any doubts about the evidence's sufficiency must be resolved in favor of the defendant. (*People v. Cole* (2007) 156 Cal.App.4th 452, 484.) We independently review the trial court's decision. (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.)

Section 166(c)(1) makes punishable "a willful and knowing violation of a protective order." The jury was instructed that to find Zalloum guilty of violating this provision it had to find that (1) there was a protective order restraining him from having any contact with Doe, (2) the order was issued "in a pending criminal proceeding involving domestic violence," (3) Zalloum "knew of the court order," (4) he "had the ability to follow the court order," and (5) he "willfully or intentionally violated the court order." (CALCRIM No. 2701.) The instruction further provided: "Someone commits an act willfully when he or she does it willingly or on purpose." (CALCRIM No. 2701; § 7, subd. (1) [defining "'willfully'"].)

"Except as to crimes that include lack of necessity (or good cause) as an element, necessity is an affirmative defense recognized based on public policy considerations." (*People v. Kearns* (1997) 55 Cal.App.4th 1128, 1134-1135 (*Kearns*).) "Necessity does not negate any element of the crime, but represents a public policy decision not to punish

10

such an individual despite proof of the crime." (*People v. Heath* (1989) 207 Cal.App.3d 892, 901.)

In order for an instruction on the necessity defense to be warranted, there must be sufficient evidence that the defendant violated the law (1) in an emergency situation to prevent a significant bodily harm or evil to themselves or to someone else, (2) when there was "no reasonable legal alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief that the criminal act was necessary to prevent the greater harm, (5) with such belief being objectively reasonable, and (6) under circumstances in which [the defendant] did not substantially contribute to the emergency." (*Kearns*, *supra*, 55 Cal.App.4th at p. 1135; CALCRIM No. 3403.) The "defendant has the burden of establishing the affirmative defense of necessity by a preponderance of the evidence." (*People v. Dewberry* (1992) 8 Cal.App.4th 1017, 1020; *People v. Condley* (1977) 69 Cal.App.3d 999, 1012-1013.)

Defense counsel requested that the jury be instructed on the defense of necessity with CALCRIM No. 3403 for the count alleging that Zalloum violated the protective order on October 5. The trial court denied the request, explaining: "The Court does not believe that there's substantial evidence of necessity, given the way that the evidence has come out on this case and the facts regarding the continuous contact between the defendant and" Doe. The court otherwise stated: "The evidence is that, I think, on 10/5/17—first of all, it says 'on or about that day.' Additionally, wasn't the order—isn't there evidence that the order was violated all over the place that day, not just . . . ."

11

The parties agree that the trial court erred by rejecting the instruction on the ground that there was evidence that Zalloum had violated the order on some day before October 5. Zalloum was charged with violating the protective order only on October 5. Both the prosecutor and defense counsel argued that the jury could find Zalloum guilty of violating the protective order only on the basis of the October 5 incident.

Notwithstanding the court's erroneous reasoning, we must affirm if the ruling was correct on any ground. (*People v. Zamudio* (2008) 43 Cal.4th 327, 351, fn. 11.) But viewing the evidence in the light most favorable to Zalloum, as we must, we conclude that there was sufficient evidence to support the necessity defense and therefore to require that the jury be instructed on it. Zalloum testified that he opened the sliding glass door to let Doe into his house on October 5 because he was worried that she would break the sliding glass door and injure herself. Though the accounts of why Doe was banging on the glass door differed, Zalloum and Doe both described her as being "hysterical" when she was banging. Given that evidence, along with Zalloum's testimony that Doe arrived at his house uninvited, there was sufficient evidence for a reasonable jury to conclude that the elements of the necessity defense were proven. (*Lemus*, *supra*, 203 Cal.App.3d at p. 477.)

A reasonable jury believing Zalloum's account of how Doe came to be at his house on October 5 could conclude that Zalloum opened the door because the possibility of the glass door breaking presented an imminent threat to Doe's safety. A reasonable jury could also conclude that Zalloum believed in good faith that violating the protective

12

order was necessary to prevent the greater harm of Doe being physically injured, which also would be objectively reasonable. Finally, a reasonable jury could have concluded that calling the police was not an adequate legal alternative (and that no other reasonable legal alternative existed) because the threatened harm was possibly imminent—that is, Doe's banging on the glass while admittedly hysterical could cause the glass to break at any moment, not leaving time for Zalloum to wait for law enforcement to respond. Finally, although there was evidence that Zalloum substantially contributed to creating the emergency by locking Doe out of the house without her keys or phone, a reasonable jury could have rejected that account and believed Zalloum, concluding that he did nothing to create the emergency. We thus conclude that the record contains substantial evidence to support the defense of necessity and that the jury therefore should have been instructed on that defense.

The People's arguments to the contrary lack merit. The People argue that Zalloum had an adequate legal alternative of calling the police and then letting Doe in "if they did not show up in a timely manner." The People also argue that there was no evidence that the glass was particularly susceptible to breaking or that Doe could have broken the glass without a hard object, given her weight. Those arguments go to the weight of the evidence and not to its sufficiency. In determining whether an affirmative defense instruction should have been given, we do not weigh the evidence or evaluate its credibility. (*Salas*, *supra*, 37 Cal.4th at p. 982.) The prosecutor could have argued those

13

points to the jury, but they are not relevant to the analysis of whether the evidence was sufficient to instruct the jury on the defense.

The People also argue that a reasonable person would not have believed that opening the door was necessary, given the "volatile" nature of the relationship, the fact that Zalloum was arrested after the June incident, and the existence of the restraining order protecting Doe from him. The argument fails because those facts are irrelevant to the question of whether an objectively reasonable person would have believed that opening the glass door was necessary to prevent Doe from injuring herself.

We next analyze whether instructional error was prejudicial. The California Supreme Court has "yet to determine whether a trial court's failure to instruct on a requested affirmative defense instruction supported by substantial evidence is federal constitutional error or state law error." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 199; *People v. Watt* (2014) 229 Cal.App.4th 1215, 1219.) We need not resolve the question in this case, because the error was prejudicial even under the state law standard. Under that standard, reversal is warranted if it is "'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*People v. Watson* (1956) 46 Cal.2d 818, 836-837 (*Watson*).) In this context, a probability "'"does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*."'" (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050.)

The jury was not told that it could acquit Zalloum if it believed his version of events but nevertheless found the elements of the crime were proven beyond a reasonable

14

doubt. The jury could have found the elements of violating the protective order satisfied by Zalloum's act of opening the door (under his version of the day's events) because he thereby "willfully or intentionally violated the court order," and he "had the ability to follow the court order" by not opening the door. As far as the jury knew, there was no way to acquit Zalloum under those circumstances. But the necessity defense would have allowed the jury to find that Zalloum violated the order while also finding him not guilty. Given that the jury deadlocked on the felony corporal injury count arising from the same events, at least one juror did not believe Doe's version of events in its entirety. Under these circumstances, there is a reasonable chance that the same jury would have returned a verdict more favorable to Zalloum concerning violation of the protective order had it been instructed on the necessity defense.

For all of these reasons, we conclude that it was prejudicial error not to instruct the jury on the defense of necessity. We accordingly reverse the conviction under section 166(c)(1) and remand for proceedings consistent with this opinion.

B. *Evidence of the Civil Action*

Zalloum contends that the trial court prejudicially erred under Evidence Code section 352 by excluding evidence of a civil action Doe had brought against him and in which she received less damages than she sought. He argues that the evidence was probative on Doe's credibility because it demonstrated that she had a motive to lie. We conclude that any error was harmless.

## 1. *Relevant Proceeding*

Before trial, the prosecutor moved to exclude "[a]ny mention of a pending civil action between the victim and defendant as it is irrelevant, it will confuse the issues, and constitute a waste of time." At a pretrial hearing, defense counsel explained to the court that the prosecution was referring to a small claims action Doe had filed against Zalloum "with overlapping allegations" in the criminal action. Doe sought $12,000 in damages, but the court awarded her $5,000. According to defense counsel, Doe was unhappy with the reduced award. Zalloum was unable to defend himself in the civil action "because he couldn't testify." Defense counsel then explained: "Then in the spring, we were discussing what restitution is, and she told the district attorney she was entitled to $40,000. Now, I think that's relevant impeachment. I think that it's motive to lie. I . . . think that she's motivated by a desire to be paid, and she's unhappy about the result of the small claims matter. And that's why I think it's relevant."

The prosecutor argued that the evidence was irrelevant because it did not tend to prove that Zalloum did not commit any of the charged offenses, and it would confuse the jury in any event. The prosecutor also argued that evidence of settlement negotiations and offers to compromise is expressly barred by Evidence Code section 1152. Defense counsel countered that statements Doe made to the prosecutor about what she believed she was owed in restitution did not amount to privileged settlement communications. Defense counsel argued that the evidence was relevant because it demonstrated that Doe was "going to try to get money out of this case."

16

The court granted the prosecutor's motion and excluded any mention of the civil action. The court did not find the information to be "highly relevant" and also found that it would "confuse the issues and be a waste of time."

2. *Analysis*

Section 273.5 makes punishable willfully inflicting corporal injury resulting in a traumatic condition upon a cohabitant or a former cohabitant. (*Id.*, subds. (a), (b)(2).)

Evidence Code section 352 provides that a trial court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." We review for abuse of discretion the trial court's decision to exclude evidence pursuant to Evidence Code section 352. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 480.)

Assuming for the sake of argument that the trial court abused its discretion by excluding evidence of the civil proceeding, we conclude that any such error was harmless. We apply the state law standard of *Watson* to determining whether the erroneous exclusion of evidence under Evidence Code section 352 was prejudicial. (*People v. Earp* (1999) 20 Cal.4th 826, 878; *Watson*, *supra*, 46 Cal.2d at p. 836.)

For the corporal injury count based on the events of June 7, Zalloum and Doe provided vastly different accounts of what happened. Although there were various inconsistencies in Doe's testimony, which tended to undermine her credibility (and which defense counsel highlighted in closing argument), there was strong evidence

17

corroborating Doe's version of what happened that night and thus strong evidence of Zalloum's guilt. Sara woke up to Doe screaming her name. Another neighbor of Zalloum's called 911 because he heard thumping and his neighbors being "verbal." When officers arrived, they heard yelling, screaming, and "thumping-type" noises from the parking lot across the apartment complex. Before the officers knocked on Zalloum's apartment door, they could hear a female voice yelling, "'Let me go,'" and "'Get off of me.'" Officers observed redness on Doe's neck and that her eyes were red and swollen, all of which was consistent with her claim that Zalloum was choking and hitting her. The officers also noticed that her forearms were red. Bruises developed on her forearms later that day.

By contrast, Zalloum's version of what happened did not account for any of the injuries Doe sustained, any of the yelling and thumping noises heard by his neighbors and the officers from across the apartment complex, or the officers' hearing Doe yelling for Zalloum to get off of her and to let her go before the officers knocked on the door.

In sum, there was ample evidence corroborating Doe's version of what happened on June 7, and there was no evidence corroborating Zalloum's version. Moreover, the jury convicted Zalloum on the corporal injury count despite the issues with Doe's credibility. For all of these reasons, we conclude that it is not reasonably probable that the jury would have reached a result more favorable to Zalloum on that count had evidence of the civil proceeding been admitted.

18

## DISPOSITION

We reverse the conviction under section 166(c)(1) and remand for further proceedings.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ                    
                                    J.


We concur:

RAMIREZ                    
                       P. J.
McKINSTER                    
                       J.