Filed 6/28/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MICHAEL ANTHONY JOINTER, <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF ORANGE COUNTY, <br><br> Respondent; <br><br> THE PEOPLE, <br><br> Real Party in Interest. | G047824 <br><br> (Super. Ct. No. 97CF1439) <br><br> O P I N I O N |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Craig E. Robison, Judge. Petition granted.

Frank Ospino, Public Defender, Jean Wilkinson, Chief Deputy Public Defender, Mark S. Brown, Assistant Public Defender, and Kira Rubin, Deputy Public Defender, for Petitioner.

No appearance for Respondent.

Tony Rackauckas, District Attorney, and Anna M. Chinowth, Deputy District Attorney, for Real Party in Interest.

\*       \*       \*

In 1998, a jury convicted defendant Michael Jointer of second degree robbery with an enhancement for the personal use of a firearm.  He had one prior serious felony conviction and five prior strike convictions.  Defendant was sentenced to an indeterminate term of 34 years to life in state prison.

In September of 2012 defendant filed a motion pursuant to Penal Code section 1405[1] seeking DNA testing of a bottle of water that was left at the scene of the crime.  The court denied the motion.  Defendant petitions for a writ of mandate ordering the trial court to grant the motion.  We conclude defendant satisfied the elements of section 1405 and the court abused its discretion in holding there was no "reasonable probability" the verdict would be more favorable had the DNA testing been performed.  Accordingly, we grant the petition.

## FACTS

On April 8, 1997, a grocery store was robbed.  The robber was a black man, with a large build, dressed in all black, with a black cowboy hat.  He approached a checkstand where the manager was working and purchased a bottle of water.  After purchasing the bottle, the robber took a drink.  The robber then walked over to the customer service desk where the funds for checkstands were kept in a locked drawer.  Behind the desk was a supervisor who had a key to the drawer.  The robber spoke to the

---

[1]      All statutory references are to the Penal Code.

2

supervisor and pulled back a portion of his coat to reveal a handgun in his waistline.  He then handed a bag to the supervisor and instructed the supervisor to fill the bag with cash.  The supervisor complied and filled the bag with cash, food stamps, and rolls of quarters.

While the robbery was happening, a grocery clerk noticed the supervisor putting money in the bag and immediately thought it might be a robbery.  The clerk observed and got a quick glance at the robber's face as the robber left the grocery store.  Also while the robbery was happening, a courtesy clerk approached the customer service desk twice, at the manager's request, seeking additional coins for a cash register, but the supervisor said nothing in response to her requests.  The courtesy clerk did not realize a robbery was occurring and did not get a good look at the robber's face.  Once the supervisor had filled the bag, the robber walked out of the store.

After the robbery took place, the manager approached the customer service desk seeking his additional money for the register.  The supervisor stated, "We just got hit."  The manager ran out of the store to try and see where the robber went, but did not see him.  The manager then called the police.

While waiting for the police to arrive, the manager and the supervisor noticed the bottle of water the robber had purchased still on top of the customer service desk.  The supervisor grabbed a napkin, placed it over the top of the bottle, and, holding the bottle by its lid, took the bottle into a nearby office.

When the police arrived, they began dusting for fingerprints.  The manager pointed out the bottle to the police, and it was also dusted for prints.  The police lifted five fingerprints from the bottle, and two fingerprints and one partial palm print from the customer service desk.  Of those prints, a police forensic specialist determined four of the prints on the bottle were of sufficient quality to submit to the "Cal. I.D." fingerprint identification system for potential matches.  The "Cal I.D." database suggested defendant as one of 10 potential matches.  After independently analyzing the four prints, the

3

forensic specialist concluded all four were the defendant's. The forensic specialist could not, however, determine when the prints were left on the bottle.

Sometime later the police showed the manager, supervisor, and grocery clerk a six person photographic lineup. In attempting to identify the robber, the manager stated, "I would say number 4, but number 2 looks similar." Number two was the defendant. The manager thus did not make a positive identification in the lineup. He did, however, positively identify the defendant in court as the robber. The police also showed the supervisor the photographic lineup. The supervisor picked number two. The supervisor also positively identified the defendant in court as the robber. The grocery clerk likewise was shown the photographic lineup and identified the robber as number two, but only tentatively. The grocery clerk could not positively identify the defendant as the robber in court, but thought he looked like the robber.

The police searched the defendant's residence. They recovered two black hats, black pants, a black leather jacket, and a black shirt, along with some documents with defendant's name on it and some photographs of defendant. The documents indicated defendant was a security guard for Ralph's Grocery Company. The police also found some ammunition and a holster for a semi-automatic handgun, but no handgun.

Prior to arresting defendant, the police arrested defendant's nephew for sale of marijuana, and, due to the nephew's resemblance to defendant, took the nephew to the police station to determine whether he was Michael Jointer, the defendant in this case. The nephew was found with a food stamp in his car. Subsequently, the nephew was arrested for bank robbery. The nephew's fingerprints, however, were not found at the scene of the grocery store robbery.

Based on the above evidence, a jury convicted defendant of second degree robbery with an enhancement for the use of a firearm. As a result of prior strikes, defendant was sentenced to 34 years to life in prison.

4

Thirteen years later, in September of 2012, defendant filed a motion pursuant to section 1405 seeking to have the bottle of water found at the scene of the crime tested for DNA. Defendant argued he met all of the requirements of section 1405, including that identity was a significant issue at trial, that there was a reasonable probability that a more favorable verdict would result from a favorable DNA finding, and that the water bottle was in a condition to be tested. The district attorney opposed the motion.

The trial court denied defendant's motion, ruling there was no reasonable probability the DNA testing would result in a more favorable verdict: "Here, there is no showing that, had the DNA testing been done and presented at trial, in light of all of the other evidence, there is a reasonable probability of a more favorable result for Defendant. The evidence at trial, as the [district attorney] points out, clearly showed that Defendant was the robber. Defendant was identified positively by one eyewitness. That eyewitness was the direct victim of the robbery. He stood face to face with Defendant so long that [a courtesy clerk] returned to ask for coins a second time. Two other eyewitnesses also identified Defendant, albeit more tentatively. Defendant's physical description closely matched the robber's. His clothes also matched the robber's. His fingerprints were on the water bottle left at the scene of the crime. His home was in Compton and the water bottle was in Orange. [¶] In sum, as in *Richardson*[ *v. Superior Court* (2008) 43 Cal.4th 1040], Defendant here may have shown that if a DNA test had been performed on the pristine water bottle in 1997, it would have been relevant to the issue of the identity of the perpetrator. [Citation] Nevertheless, there is a substantial amount of other evidence linking Defendant to the robbery. On that basis, the court may easily determine that the within motion fails to establish a reasonable probability of a more favorable outcome for Defendant if the DNA test were performed."

Defendant timely petitioned for a writ of mandate directing the trial court to grant the motion for DNA testing. (§ 1405, subd. (j).) We issued an order to show cause.

5

DISCUSSION

Section 1405, subdivision (a) permits "[a] person who was convicted of a felony and is currently serving a term of imprisonment" to "make a written motion . . . for . . . forensic [DNA] testing."  The purpose of section 1405 is to provide a procedure "for the post-conviction testing of DNA evidence for defendants who did not have that technology available at the time of trial and where identity was a significant issue that resulted in his or her conviction."  (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1342 (1999-2000 Reg. Sess.) as amended Mar. 30, 2000.)

Under section 1405, subdivision (f), "The court shall grant the motion for DNA testing if it determines all of the following have been established:  [¶]  (1) The evidence to be tested is available and in a condition that would permit the DNA testing requested in the motion.  [¶]  (2) The evidence to be tested has been subject to a chain of custody sufficient to establish it has not been substituted, tampered with, replaced or altered in any material aspect.  [¶]  (3) The identity of the perpetrator of the crime was, or should have been, a significant issue in the case.  [¶]  (4) The convicted person has made a prima facie showing that the evidence sought to be tested is material to the issue of the convicted person's identity as the perpetrator of, or accomplice to, the crime, special circumstance, or enhancement allegation that resulted in the conviction or sentence.  [¶] (5) The requested DNA testing results would raise a reasonable probability that, in light of all the evidence, the convicted person's verdict or sentence would have been more favorable if the results of DNA testing had been available at the time of conviction. The court in its discretion may consider any evidence whether or not it was introduced at trial. [¶]  (6) The evidence sought to be tested meets either of the following conditions:  [¶] (A) The evidence was not tested previously.  [¶]  (B) The evidence was tested previously, but the requested DNA test would provide results that are reasonably more discriminating and probative of the identity of the perpetrator or accomplice or have a reasonable

6

probability of contradicting prior test results. [¶] (7) The testing requested employs a method generally accepted within the relevant scientific community. [¶] (8) The motion is not made solely for the purpose of delay."

Our review of the trial court's determination is for abuse of discretion. (*Richardson v. Superior Court*, *supra*, 43 Cal.4th 1040, 1047 (*Richardson*).)

In denying the motion, the trial court relied on section 1405, subdivision (f)(5), finding there was no reasonable probability defendant's conviction would have been more favorable had the DNA testing been available, due to the "substantial amount" of other evidence linking defendant to the crime.

The only case interpreting section 1405, subdivision (f)(5) is *Richardson*, *supra*, 43 Cal.4th 1040. "[I]n the context of section 1405, the term 'reasonable probability' has the same meaning it has in the *Strickland* [*v. Washington* (1984) 466 U.S. 668] and [*People v. Watson* (1956) 46 Cal.2d 818] contexts." (*Id*. at p. 1050.) "[T]o prevail on a section 1405 motion, the defendant must demonstrate that, had the DNA testing been available, in light of all of the evidence, there is a reasonable probability — that is, a reasonable chance and not merely an abstract possibility — that the defendant would have obtained a more favorable result." (*Id.* at p. 1051.) While emphasizing the probability must be "reasonable" and not merely "abstract," the court also cautioned against imposing too great a burden: "In making this assessment, however, it is important for the trial court to bear in mind that the question before it is whether the defendant is entitled to develop potentially exculpatory evidence and not whether he or she is entitled to some form of ultimate relief such as the granting of a petition for habeas corpus based on that evidence. As the Ninth Circuit observed in an analogous decision, 'Obtaining post-conviction access to evidence is not habeas relief.' [Citation.] Therefore, the trial court does not, and should not, decide whether, assuming a DNA test result favorable to the defendant, that evidence in and of itself would ultimately require some form of relief from the conviction." (*Ibid.*)

Importantly, as *Richardson* makes clear, the question is whether there is a reasonable probability of a more favorable verdict *assuming the DNA test came back favorable to defendant*. In articulating the standard of review under section 1405, the *Richardson* court stated the presumption is a favorable DNA test for the defendant: "Because this determination is necessarily based upon the trial court's judgment — that is, its evaluation of the weight of trial evidence in relation to DNA testing *presumably favorable to petitioner* — its decision is a discretionary, rather than a ministerial, one." (*Richardson*, *supra*, 43 Cal.4th at p. 1047, italics added.) Further, in articulating the standard for materiality in section 1405, subdivision (f)(4), the court again reiterated we are to assume a favorable test: "That is, the defendant is not required to show *a favorable test* would conclusively establish his or her innocence. It would be sufficient for the defendant to show that the identity of the perpetrator of, or accomplice to, the crime was a controverted issue as to which the results of DNA testing would be relevant evidence." (*Richardson*, at p. 1049, italics added.) Finally, in emphasizing the narrowness of the inquiry under section 1405, the *Richardson* court again referred to a presumption of a favorable DNA test: "the trial court does not, and should not, decide whether, *assuming a DNA test result favorable to the defendant*, that evidence in and of itself would ultimately require some form of relief from the conviction." (*Richardson*, at p. 1051, italics added.)

This interpretation is consistent with the text of section 1405. Section 1405, subdivision (f)(4) requires "[t]he convicted person [to make] a prima facie showing that the evidence sought to be tested is material to the issue of . . . identity . . . ." Section 1405, subdivision (f)(5), by contrast, which contains the requirement of a "reasonable probability" of a better result, imposes no burden to make a prima facie showing regarding what the results of the DNA testing would be. The statements in *Richardson* combined with the text of section 1405 lead us to conclude that our task is not to

speculate about what the results of DNA testing would be, but instead to decide whether a result favorable to defendant could reasonably have impacted the outcome.

Applying these principles here, we conclude the trial court abused its discretion in denying the motion.

The only disputed issue as to the robbery was identity. As the prosecutor stated in closing argument, "[T]he issue is not whether or not the robbery occurred or that it was a robbery, but rather who committed the robbery. [¶] The ultimate issue is identity." The defense attorney agreed: "of paramount importance and the reason we are all here is the identification of the robber."

The sole physical evidence linking defendant to the crime was the water bottle with the finger prints. By both parties' accounts, the water bottle was a crucial piece of evidence in the case. The prosecutor referred to it as a "key piece of important evidence," and stated the case "is in essence a circle of evidence which begins and ends with the bottle of Aquafina water which in fact was purchased by Mr. Jointer shortly before he committed the robbery." Similarly, defense counsel referred to it as "critical evidence in this case." The evidence showed the robber drank from the water bottle, and thus the water bottle possibly contains the robber's DNA.

Given the central importance of the water bottle, assuming the DNA test came back favorable for the defendant, there is a reasonable probability of a more favorable verdict for defendant. Although defendant's fingerprints were found on the bottle, the People's expert conceded she could not pinpoint when the fingerprints were put on the bottle. Absent DNA evidence, that bare concession was understandably not enough to create reasonable doubt in the jurors' minds. But combined with favorable DNA results, that otherwise minor gap in the prosecution's logic would take on significantly greater importance.

The remaining evidence was not conclusive. The strongest evidence was the supervisor's eye-witness identification in the photographic lineup. The manager and

9

grocery clerk's photographic lineup identifications were of less value, as both were tentative and uncertain. Also, both the supervisor and manager identified the defendant at trial, which was 15 months after the robbery. But as the United States Supreme Court (together with many other courts) has recognized, "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." (*United States v. Wade* (1967) 388 U.S. 218, 228.) The risk of misidentification is higher here because it was a cross-racial identification. (*People v. McDonald* (1984) 37 Cal.3d 351, 368, overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914 [noting "an eyewitness is more accurate in identifying a person of his own race than one of another race" and "studies establish that the effect is strongest when white witnesses attempt to recognize black subjects," as was the case here].) Thus while the eyewitness identifications were significant evidence, they were not infallible.

The only other evidence was the bullets, holster, and black clothing found at defendant's residence. But the fact the defendant owned a gun (not necessarily the gun used in the robbery) is unremarkable, particularly since defendant was a security guard. Nor is it unusual to own black clothing.

Finally, the evidence showed at least some possibility defendant's nephew could have been involved in the crime.

None of this is to say the evidence was insufficient to support the verdict or that defendant would be entitled to habeas or other relief. We hold only that favorable DNA evidence would be sufficiently exculpatory in the context of this case to create a reasonable probability of a more favorable verdict for the defendant.

The trial court relied heavily on the holding in *Richardson* affirming the denial of a motion for DNA testing. *Richardson* is distinguishable, however, because there the evidence to be DNA tested was at best a weak link between the defendant and

10

the crime, and was overshadowed by more probative evidence. (*Richardson*, *supra*, 43 Cal.4th at pp. 1051-1053.)

In *Richardson* a jury convicted defendant of murdering an 11-year-old girl and found special circumstances of burglary, rape, sodomy, and lewd and lascivious acts on a child under the age of 14. (*Richardson, supra*, 43 Cal.4th at p. 1044.) The victim was found dead in a bathtub in her residence, where certain hair samples were recovered and used as evidence at trial. Defendant moved for postconviction DNA testing of the hair samples. At the underlying trial, the People's two experts opined the hair samples were consistent with the defendant's hair. They could not, however, agree between themselves which of the hairs was consistent with the defendant's hair. (*Id.* at pp. 1051-1052.) As a result, "it was clear that it was far from definitive and subject to quite different interpretations from equally qualified experts." (*Id.* at p. 1052.) Further, defense counsel effectively cross-examined the experts, eliciting concessions that hair analysis involved "'quite a bit of subjectivity'" and was a "'subjective process.'" (*Ibid.*) Also, the defendant's experts disputed the prosecution experts' conclusions that various hair samples were consistent with defendant's hair. Collectively, "'the defense did a good job of downplaying the significance of hair evidence.'" (*Ibid.*)

"By contrast, the evidence that petitioner was the perpetrator was strong. . . . [I]n addition to the hair evidence, 'defendant's statement to a witness evincing awareness that the victim, whom he knew, was alone on the night she was murdered; . . . defendant's statements in the immediate aftermath of the murder in which he either admitted killing the victim or revealed details about the murder that had not been released to the public; . . . defendant's flight from the scene the day after the murder; . . . defendant's shifting stories in statements he made to the police culminating in an admission — quickly retracted — that he had committed the murder; . . . defendant's statement to a fellow inmate that he had murdered Holley; . . . [and] [a coconspirator's] subsequent attempt to commit a similar crime against another victim.'"

11

(*Richardson*, *supra*, 43 Cal.4th at p. 1053.) "In short, as the trial court observed, the hair evidence was, at most, simply one piece of evidence tending to show guilt and it was fiercely disputed by the defense to the point that it may well have had little significance in the jury's determination of guilt or sentence." (*Ibid.*)

We cannot say the same of the water bottle in this case. Both parties recognized the central importance of the finger prints on the water bottle. And given the prosecution's inability to prove when the fingerprints were put on the bottle, it is reasonably probable a favorable DNA test would undermine the prosecution's most important piece of evidence. There were no confessions, as in *Richardson*. Instead, the remaining evidence was fallible eyewitness identifications and relatively weak circumstantial evidence. Taken together, there is a reasonable probability a favorable DNA test for defendant would impact the outcome.

In reaching this conclusion, we are mindful of our Supreme Court's admonition "to bear in mind that the question before it is whether the defendant is entitled to develop potentially exculpatory evidence and not whether he or she is entitled to some form of ultimate relief such as the granting of a petition for habeas corpus based on that evidence." (*Richardson*, *supra*, 43 Cal.4th at p. 1051.) In our view, the concerns of Justice Chin, though expressed in a dissent, are consistent with the principle articulated by the *Richardson* majority: "The problem is that all of this litigation, both in the trial court and in this court, all of this effort, by the parties and this court, all of this analysis and examination of a massive record, has been done solely to determine whether the hairs should be tested. This four-year effort has undoubtedly been far more expensive — in terms of monetary costs, passage of time, and expenditure of judicial resources — than if the hairs simply had been tested four years ago. If the trial court had ordered the testing, or the parties had simply agreed to it, then the results would long since have been known. If the testing confirmed that the hairs, or some of them, were defendant's, it would provide additional evidence of his guilt, and any doubts on this point would have been

12

laid to rest. If the testing showed that the hairs belonged to one of the other possible suspects, or possibly an unknown person or persons, then the parties and judiciary could consider the significance of concrete results of actual testing rather than making abstract decisions regarding hypothetical results of hypothetical testing." (*Id.* at pp. 1055-1056 (dis. opn. of Chin, J.).) In light of these concerns, trial courts should liberally apply the "reasonable probability" standard to permit testing in questionable cases.

## DISPOSITION

The petition for writ of mandate is granted. Let a writ of mandate issue directing the respondent court to vacate its December 4, 2012 order denying defendant's motion seeking DNA testing and enter a new order granting the motion. Having served its purpose, the order to show cause is discharged.

IKOLA, J.

WE CONCUR:

RYLAARSDAM, ACTING P. J.

THOMPSON, J.

13