Filed 11/26/14  Richards v. Super. Ct. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| WILLIAM JOSEPH RICHARDS, | |
| Petitioner, | E060568 |
| v. | (Super.Ct.No. FV100826) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | OPINION |
| Respondent; | |
| THE PEOPLE, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for writ of mandate.  Margaret Powers, Judge.  Petition denied.

California Innocence Project, Justin Brooks, Jan Stiglitz, Alexander Simpson and Raquel Cohen for Petitioner.

No appearance for Respondent.

1

Michael A. Ramos, District Attorney, and Stephanie H. Zeitlin, Deputy District Attorney, for Real Party in Interest.

Convicted in 1997 of first degree murder, petitioner William Joseph Richards filed a motion pursuant to Penal Code section 1405[1] seeking DNA testing of the victim's (his wife Pamela[2]) jeans, fingernail scrapings, and fist-sized rocks found at the crime scene. Following a hearing on January 22, 2014, the superior court denied the motion. Richards seeks writ review of that denial, contending that the superior court abused its discretion when it did not presume favorable results would raise a reasonable probability the verdict would have been more favorable had the DNA testing been performed. We find that the court did not abuse its discretion. Accordingly, we deny the petition.[3]

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

[2] We use Mrs. Richards' first name, not from lack of respect, but to avoid confusion.

[3] After we summarily denied the petition, Richards sought review in the Supreme Court. The Supreme Court granted the petition and transferred the matter to this court with directions to issue an order to show cause "returnable before [this] court in light of *Richardson v. Superior Court* (2008) 43 Cal.4th 1040 and *People v. Jointer* (2013) 217 Cal.App.4th 759, 765-766." We have done so and conclude that denial of the petition is consistent with these decisions.

Richards and his wife Pamela lived in a camper parked on their property in a remote area of San Bernardino County. A generator, kept in a small shed, was used for electricity. One had to ascend a steep sand and gravel driveway to access the couple's home.

Eugene Price had a sexual relationship with Pamela, and she was planning to move with him to an apartment in Ventura County. At approximately 11:55 p.m. on August 10, 1993, Price telephoned the camper in response to a message Pamela left on his answering machine around 7:00 or 7:30 that evening. Richards answered the call, sounding stressed and agitated. When Price asked for Pamela, Richards said that she was dead. Price told him to call 911. Richards did so at 11:58 p.m.

Deputy Nourse was dispatched to the location, arriving about a half hour after the call, 12:30 a.m. There were no lights and no moonlight. The sky was overcast. Deputy Nourse saw two vehicles, a small shack house, and Richards. Richards was wearing blue jeans and a blue jean-type shirt, and he had blood on him. Richards told Nourse that he had just arrived home from work and found his wife lying face down, and he rolled her over. He said he immediately called 911 and then cradled her head in his arms.

As Deputy Nourse began walking toward the body, Richards followed closely and volunteered that "she is stone cold, you don't have to go back there and check her."

---

[4] This synopsis is adapted from the factual summaries set forth in our opinion affirming Richards' conviction (*People v. Richards* (Aug. 17, 2000, E024365 [nonpub. opn.]), and the Supreme Court's opinion denying his petition for habeas corpus (*In re Richards* (2012) 55 Cal.4th 948).

Pamela's body was neither warm nor cold, but seemed fresh. Large portions of her skull were missing and one eye was hanging out. There was a puddle of blood that was fresh, bright red and wet. Pamela's hair was full of bright red, wet blood. The blood on the sand near her head had the same consistency and had yet to soak in. Based on the deputy's experience, it appeared that she had just died.

Despite the fact that the night was overcast and very dark, and only a half hour had transpired between petitioner's reported arrival at home and Nourse's arrival, Richards was able to take the deputy on a detailed tour of the crime scene. Richards continued to volunteer statements. He stated several times, "that brick right there, that's the one that killed her, that's what they used to finish her off with." Defendant said there was a stepping stone on the side of the hill with blood on it, but the deputy could not see it. Defendant indicated he had been back by the generator. Defendant then stated that Pamela's pants were by the generator, and they did not come off easily, adding, "trust me on this." Richards also knew that Pamela's underwear was inside the camper and that her blood was on a pillow, also inside. He also knew there was blood on rocks up against the hill, referring to the rough, upward-sloping terrain to the southwest of the crime scene. Richards theorized about what Pamela was doing when her murderer arrived, where the murderer confronted Pamela, and what she did in her defense. When Deputy Nourse told Richards that they needed to leave the crime scene so that he could secure it, he fell to his knees and stated, "it don't matter any, all the evidence that relates to this case I already touched and moved trying to figure out how this whole thing happened."

4

Richards' demeanor vacillated from seemingly rehearsed calmness to bawling, sobbing and falling down on the ground. It seemed to the deputy that Richards was speaking "like he had rehearsed or was reading from a script." His dogs barked, growled and snarled at Deputy Nourse. Richards remarked that they had failed to protect Pamela from her murderer. He did not report anything missing from the premises.

Norman Parent, a sheriff's homicide detective, was dispatched to the scene, arriving at 3:15 a.m. on August 11, 1993. Deputy Nourse briefed Detective Parent on what he had seen up to that point, and a decision was made not to process the crime scene until first light, and no one entered the scene. At first light, around 6:00 a.m., Detective Parent, Deputy Nourse, Criminalist Dan Gregonis and Forensic Specialist Valerie Seleska began processing the scene.

Detective Parent ascended to the small plateau where the house was located. On the property, about 100 yards from the dirt roadway, was a shed with a wooden deck or porch and a travel trailer. The wood shed was unlocked with the door slightly ajar. Inside were numerous guns, including five or six rifles. A smaller wood shed contained a generator. There was a Ford Ranger pickup truck, subsequently determined to be Richards', which had a gun in it. There was also a Suzuki Samurai, subsequently determined to be Pamela's, which contained a purse. Inside the purse, there were several items identifying Pamela, and a letter[5] detailing a property division between her and Defendant.

---

[5] The letter, which was signed, was dated July 14, 1993. It stated: "I, William Richards, relinquish all claim to joint properties between myself and my wife Pamela

*[footnote continued on next page]*

5

They found Pamela's body, face up by the porch, and covered by a sleeping bag. She was naked from the waist down except for a pair of socks. There was a large pool of blood beside her. They found various items belonging to Pamela, including two white canvas shoes, a broken fingernail, denim pants by the generator, and panties inside the trailer. They also found pillow cases and a telephone in the camper, two 12-inch stepping stones, and an 8- by 6- by 16-inch cinder (cement) block near her body. All the above items contained various amounts of blood, as did the shed and many other areas, including the ground and rocks on the property. The position of the stepping stones, cinder block and the body led Detective Parent to the conclusion that they had been used to smash her head. The murder appeared to have occurred by the porch area, and someone appeared to have bled in the trailer. No struggle appeared to have occurred by the generator.

Detective Parent checked the tires of Deputy Nourse's patrol car and ascertained where it had been driven and came to a stop. He also checked the tires of Richards' Ford Ranger and Pamela's Samurai and tracked where they came up the driveway and stopped. There were no other tread marks. Three of Pamela's shoeprints were found on the property. Richards's shoes were very worn and would leave very little shoe track. Only one of Richards's shoeprints was found. Detective Parent accounted for all shoeprints, including himself and everyone who had been at the crime scene, and found none he could not account for. Until about 8:00 p.m., Detective Parent and his team fanned out in about a 100-

Richards, except for my tools, guns, Warrior and fifty percent of the equity in the land we own in Summit Valley. This includes profit sharing earned while we were together."

yard radius down a hill around the crime scene to check for any signs that someone had come up the hill onto the property. They found nothing.

Dan Gregonis was a criminalist in the sheriff's crime lab. Gregonis collected blood from the crime scene, including from the wooden porch, soil around Pamela's body, the sleeping bag, the pool of blood around the body, the pillow cases, Pamela's shoes, the stepping stones, the cinder block, the telephone, Pamela's pants, and Richards's clothes. There was evidence of crime scene manipulation. A sex kit was performed on Pamela and the results were negative for semen or any other evidence of sexual assault.

Gregonis collected two fingertips with broken fingernails from the autopsy. There was a tuft of 14 or 15 light blue, cotton fibers jammed into one of the nails. The fibers were indistinguishable from the fibers of the shirt Richards was wearing the night of the murder. Gregonis could not say definitively that the fibers came from Richards' shirt, but there were no significant differences. The same fibers were not, however, mentioned in the report of Craig Ogino, another criminalist who testified for the prosecution at trial and who may have examined the same fingertips.

DNA testing established that the bloodstains on Richards' pants and shoes belonged to Pamela. A criminalist determined that the stains were from blood spatter, not from drips or contact, indicating that the blood hit Richards' pants and shoes when Pamela's skull was smashed. There were 30 to 40 blood stains on Pamela's pants, of which 12 consisted of medium energy spatter. There was no spatter on her bare legs. Gregonis opined that Pamela was wearing her pants when her skull was caved in.

7

The stepping stones contained medium energy blood spatter, by an object hitting something causing blood to spurt out from its source. Gregonis opined that the stepping stones were not dropped on Pamela's head, but were close to the impact. The cinder block was slightly broken, had an area of saturated blood, and also contained a very low angle medium energy spatter. Based on the blood, the medium energy spatter, and hairs taken off the block, Gregonis opined that the cinder block was used to bash in Pamela's skull. Gregonis also opined, based on the amount of medium energy blood spatter and pooled blood on it, that one of the stepping stones may also have been thrown or dropped on her head.

An autopsy determined that Pamela had been manually strangled and had suffered massive blunt force trauma injury to her skull. The pathologist opined that the injuries to her neck would have been fatal even without blunt force trauma to her head.

PROCEDURAL HISTORY

In July 1997, Richards was convicted of the first degree murder of Pamela following a fourth jury trial. He was sentenced to 25 years to life. This court affirmed his conviction on appeal. (*People v. Richards* (Aug. 17, 2000, E024365) [nonpub. opn.].)

In December 2007, Richards filed a petition for habeas relief claiming that the introduction of bite mark evidence at trial was false and that new forensic tools now excluded him as the person responsible for the bite mark. He also alleged that: (1) new evidence obtained through DNA testing showed that someone other than he held one of the alleged murder weapons exactly where the prosecution suspected the murderer's DNA to

8

be; (2) a hair belonging to someone other than he had been found under Pamela's fingernail; and (3) the tuft of fiber similar to the material in his shirt did not become lodged Pamela's fingernail during her struggle with her killer.  After hearing the testimony and reviewing the record, the trial court granted Richards habeas corpus relief on the grounds that new forensic evidence suggested the conviction was fatally flawed.

The People appealed and this court reversed.  (*People v. Richards* (Nov. 19, 2010, E049135) [nonpub. opn.].)  The Supreme Court affirmed our decision.  (*In re Richards* (2012) 55 Cal.4th 948.)  A major portion of the Supreme Court's decision dealt with Richards' claim that his murder conviction was based on false evidence given at trial by the prosecution's dental expert.  The expert had testified that a photograph of Pamela's hand showed a lesion consistent with a human bite mark.  Furthermore, he opined that it appeared to be consistent with the unusual dentition of Richards' lower teeth.  A defense expert testified that the angular distortion in the photograph of the lesion prevented an accurate determination of whether or not it was a human bite mark.  In a declaration supporting the habeas corpus petition, the prosecution's dental expert stated that his trial testimony regarding the statistical frequency of the Richards' dentition was not based on scientific data and, furthermore, he was no longer certain that the lesion on Pamela's hand was a bite mark. The Supreme Court concluded that the opinion this expert offered at trial did not constitute false evidence.  When considered as new evidence, it did not meet the standard to justify habeas corpus relief because it did not point unerringly to innocence or reduced culpability under the standard set forth in *In re Clark* (1993) 5 Cal.4th 750, 766.  The Supreme Court

9

also considered and rejected Richards' claim that other pieces of new evidence either singly or cumulatively met this standard.

Specifically, Richards claimed there was new evidence with regard to blue fibers lodged in a crack in one of the fingernails. Those fibers matched fibers from the blue cotton shirt Richards was wearing on the night of the murder. He argued that the blue fibers may have been embedded into the fingernail after the crime because their presence was not noted in the report of the prosecution trial witness who initially examined Pamela's fingertips and fingers. The Supreme Court concluded the fibers may have been overlooked in this initial examination, and were discovered only later by a criminalist using a microscope. In any case, evidence that the blue fibers may have come from a source other than Richards did not unerringly establish his innocence.

Similarly, the Supreme Court concluded the presence of a hair belonging to an unidentified male did not point to Richards' innocence, because it could have come from someone Pamela encountered at work or elsewhere, and it could have been lodged under Pamela's fingernail for a day or more without being noticed.

Finally, after the trial, Richards' expert found traces of male DNA not belonging to Richards in the approximate location on the paving stone where the murderer's DNA might be expected to be. The prosecution's criminalist, Gregonis, testified at the habeas corpus evidentiary hearing that the small amount of DNA could have come from contamination of the evidence during courtroom handling. The Supreme Court again concluded that the presence of trace amount of DNA did not point unerringly to Richards' innocence. The

10

court observed that the evidence that Richards was the actual murderer was strong. (*In re Richards*, *supra*, 55 Cal.4th 948, 970.)

In October 2013, Richards filed a postconviction motion pursuant to section 1405, requesting DNA testing of: (1) the jeans worn by Pamela (Exhibit 131;Item 241); (2) fingernail scrapings (Items A-22 [Fingernail from ground], C-14 [Two finger tips], C-8 [RT Fingernail], and C-9 [LT Fingernail]); and (3) fist-sized rocks (Items A-6) alleged by the prosecution to have been used in Pamela's murder. Richards noted that the jeans were previously tested, but only conventional "presumptive" testing was conducted to determine whether testable amounts of DNA could be found. Although no testable amounts were found, Richards contends that these crude tests probably missed amounts now discoverable through "touch DNA" and the more sophisticated processes available today. He indicated that the fingernail scrapings have not been tested except for an examination conducted in 2005. At that time, only a piece of cloth found underneath one of the fingernails was subjected to DNA tests. He specifically requests that the items be tested using various "STR and/or Y-STR DNA methods of testing used today."

Richards contends that if any one of these items are tested and yield a profile that does not match either Richards or Pamela, it will mean there is a reasonable probability in light of all the evidence that the verdict or sentence would have been more favorable at trial. In addition, if the same DNA profile, other than Richards', is discovered on two or all three items, this will provide almost certain evidence that the true perpetrator was the source of

11

the profile. If the profile could be uploaded and matched to an individual, Richards argued that would be even more persuasive that person was the perpetrator.

In opposition, the People stated the items had already been tested and that further testing, regardless of the result, would not reasonably lead to a more favorable trial outcome.

The superior court denied the motion for additional testing. It noted that it is Richards' burden to show it is likely something would come up that would be favorable, "not to prove [his] innocence but at least to give you something to look into as to whether it may have been somebody . . . . [¶] I just don't think you've met your burden here." The court made additional comments that, "we're stretching too far to dig for something," and it "just seems speculative."

## DISCUSSION

Section 1405 provides for postconviction DNA testing if identity was—or should have been—an issue at trial. The court must grant the motion if it determines all of the following have been established: "(1) The evidence to be tested is available and in a condition that would permit the DNA testing requested in the motion. [¶] (2) The evidence to be tested has been subject to a chain of custody sufficient to establish it has not been substituted, tampered with, replaced or altered in any material aspect. [¶] (3) The identity of the perpetrator of the crime was, or should have been, a significant issue in the case. [¶] (4) The convicted person has made a prima facie showing that the evidence sought to be tested is material to the issue of the convicted person's identity as the perpetrator of . . . the

12

crime . . . or enhancement allegation that resulted in the conviction or sentence.  [¶]  (5)  The requested DNA testing results would raise a reasonable probability that, in light of all the evidence, the convicted person's verdict or sentence would have been more favorable if the results of DNA testing had been available at the time of conviction."  (Pen. Code, § 1405, subd. (f).)

The moving defendant meets the materiality requirement in section 1405, subdivision (f)(4), by demonstrating that the DNA testing he or she seeks would be relevant to the issue of identity, rather than dispositive of it.  Richards met this requirement because the identity of the perpetrator was a controverted issue.  (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1049.)

However, as *Richardson* instructs us, the moving defendant is not entitled to DNA testing by merely making a prima facie showing of materiality.  The trial court must further assess whether "in light of all the evidence," the DNA results would raise a reasonable probability the convicted person's verdict would have been more favorable if the results of DNA had been available at the time of conviction.  In this context, a reasonable probability means a reasonable chance and not merely an abstract possibility that the defendant would have obtained a more favorable result.  (*Richardson*, *supra*, 43 Cal.4th at pp. 1050-1051; see also *Jointer v. Superior Court* (2013) 217 Cal.App.4th 759, 765.)  In making its assessment

13

of reasonable probability, the trial court assumes the DNA test comes back favorable to the defendant.[6]

Here, accordingly, it will be assumed that test results would disclose the presence of DNA on these items, which does not match either Richards' or Pamela's profile. We will even assume that the results will show redundant DNA profiles from two or more items that do not match the profiles of either Richards or Pamela. It is not reasonably probable, given such favorable results, that Richards would have obtained a more favorable verdict at trial. Contrary to Richards' assertion, biological evidence retrieved from any of these items is not necessarily from the murderer. The Supreme Court in *In re Richards*, *supra*, 55 Cal.4th 948, noted that the hair from an unknown third person found under Pamela's fingernail might have been lodged there for a day or more. Also, trace amounts of DNA from an unknown male on the paving stone could have come from contamination. The same doubts would arise with regard to results from this new round of DNA tests since it could not be determined when any biological material was deposited. Even redundant test results showing the DNA from two or more items came from the same donor would have only speculative value because of these issues.

_____

[6] Richards argues that the trial court misinterpreted the standard, pointing to its comments that defense counsel was "stretching too far to dig for something" and it "just seems speculative." These stray comments are ambiguous and do not clearly indicate the court was not presuming favorable results. Defense counsel set forth the proper standard in arguing to the court. The People's argument in response was that DNA from an unknown male had already been found on pieces of evidence and additional results showing unknown male DNA, even a redundant profile, would not meet the reasonable probability standard.

Contrast this with the situation in *Jointer v. Superior Court*, *supra*, 217 Cal.App.4th 759, where it was found that the trial court abused its discretion in denying the motion for DNA testing of a water bottle. Assuming that the DNA test result was favorable, the appellate court concluded there was a reasonable probability of a more favorable verdict for the defendant. There, the water bottle had been used by the robber during the course of the robbery, and any DNA obtained from it must necessarily have come from the perpetrator.

The trial court had to evaluate the weight of trial evidence in relation to DNA testing presumably favorable to Richards, bearing in mind that the question is whether he is entitled to develop potentially exculpatory evidence, not whether he is entitled to ultimate relief, such as the granting of a habeas corpus petition. (*Richardson v. Superior Court*, *supra*, 43 Cal.4th 1040, 1051.) The trial court's decision is a discretionary one and we review for abuse of discretion. (*Id.* at p. 1047.) We find no abuse of discretion in this case. Although there were some weaknesses in the case, particularly with regard to the forensic evidence, these weaknesses were brought out during trial. The circumstantial evidence against Richards was persuasive as previously discussed by the Supreme Court. Richards had the motive and the opportunity. A divorce was imminent. His conduct, statements, and demeanor at the scene were more than a little suspicious. He took the deputy on a detailed tour of the crime scene, despite the darkness and his claim he arrived only shortly before calling 911. He knew were Pamela's pants and underwear were located; he knew what happened to her, and pointed out the "brick . . . that killed her" when Deputy Nourse could not see it. There was blood splatter evidence and evidence of crime scene manipulation, but

15

there was no evidence that anyone other than Richards and the officers had been at this remote location. Nor was there evidence that the killing was motivated by reasons related to theft or sex. Against the weight of this evidence, favorable DNA test results would raise only an abstract, indeed speculative possibility of a more favorable verdict.

<u>DISPOSITION</u>

The order to show cause is discharged, and the petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>HOLLENHORST</u>
J.

We concur:

<u>RAMIREZ</u>
P. J.

<u>MILLER</u>
J.

16