Filed 8/18/23  P. v. Harris CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br>    Plaintiff and Respondent,<br><br>v.<br><br>NOAH MICHAEL HARRIS,<br>    Defendant and Appellant. | A164007<br><br><br><br>(Contra Costa County<br>Super. Ct. No. 1196158 ) |

Defendant Noah Michael Harris was convicted by a jury of attempted murder (Pen. Code[1] §§ 187, subd. (a), 664)(count 1); elder abuse (§ 368, subd. (b)(1))(count 2); assault with a deadly or dangerous weapon (§ 245, subd.(a)(1))(count 3); dissuading a witness from reporting a crime (§ 136.1, subd. (a)(1)) (count 4); and making criminal threats (§ 422, subd. (a)) (count 5).  The jury also found true allegations that Harris used a deadly or dangerous weapon (§ 12022, subd. (b)(1))(count 1) and inflicted great bodily injury on a person 70 years of age or older (§ 12022.7, subd. (c)) (counts 1 and 3).  He was sentenced to an aggregate term of 9 years in state prison.

---

[1]    All undesignated statutory references are to the Penal Code.

1

The convictions arose from an incident during which the victim, 71 years old at the time, was driving in a public park roadway when Harris threw a rock toward the back of his car. Harris and the victim then engaged in a heated verbal altercation before the victim began driving away. While there appeared no obstacle to the victim continuing to drive away, he instead backed up his car (with Harris also backing up on foot) and then drove toward Harris. Within seconds, the victim stopped his vehicle and Harris cut the side of the victim's neck, resulting in an injury requiring numerous stitches. The victim then drove forward a short distance and called 911. Harris contends the victim tried to hit him with his car and he was acting in the heat of passion when he cut the victim's neck. The prosecution argued the victim was simply trying to scare Harris off though the victim told police after the incident that he accelerated to try to kill him.

On appeal, Harris challenges only the attempted murder conviction based on the argument (among others) that the trial court committed prejudicial error by refusing to instruct the jury on the lesser offense of a heat of passion theory of attempted voluntary manslaughter. We agree the trial court prejudicially erred and, accordingly, shall reverse the conviction for attempted murder.[2] While the trial court's failure to properly instruct requires the attempted murder conviction be reversed, the People shall have the option of

---

[2] Given this determination, we do not address the arguments that the attempted murder conviction cannot stand because of the admission of prior offense evidence to prove Harris's intent to kill the victim, the exclusion of evidence of Harris's 2015 auto accident to support his claim that he acted in unreasonable self-defense, and the use of CALCRIM No. 600 (elements of attempted murder). In addition, the sentencing issues raised on appeal are rendered moot.

accepting a modification of judgment to reflect a conviction of attempted voluntary manslaughter.

## FACTUAL AND PROCEDURAL BACKGROUND

The charges against Harris arose from his encounter with the 71-year-old victim on May 27, 2021. The trial took place over three days in September 2021, during which the prosecution presented four witnesses and introduced into evidence three one-minute video clips taken from the victim's car dashboard camera. Harris did not testify or present any witnesses.

*Video Evidence*

The video evidence included both video and audio. The jurors were given transcripts (not marked as exhibits) and were instructed as follows: "The transcripts are not evidence. They won't be going with you in the jury room. The evidence are the discs."

The video introduced as People's Exhibit 1 was played in open court. It begins with the victim's car waiting at a red light at an intersection for approximately 25 seconds before driving straight ahead and then taking a left to enter the road inside a park. Immediately upon entering the park area, there are approximately 15 diagonal parking spaces to the left that are partially occupied. Harris and an apparent companion (with a shopping cart) can be seen crossing the road from the right to the left side of the road a couple of cars ahead of the victim and stopping in an empty parking space. A few seconds before the video ends, Harris can be seen turning toward the victim's car as the victim passes them. Within a second, the victim stops his car and exclaims "What the fuck is your problem."

3

The beginning of the video introduced as People's Exhibit 2, which was also played in open court, appears to pick up around the time the first video stops. Someone [Harris or his companion] states "I don't know what you are looking at me for" and the victim responds "You threw something at my car" – this is followed by someone appearing to say "I didn't throw shit at your car" although what is said is difficult to hear over the victim's dog barking. The victim states "get the fuck out of here" followed by someone (Harris or his companion) saying words to the effect of "you want to die today." Harris and the victim continue to exchange words (including the victim calling Harris "a piece of shit" and telling him "you're so fucked up") as Harris's companion walks away with the shopping cart. At around the 29-second mark, the victim slowly drives forward a very short distance before backing up around the 33-second mark (the beeping of the car going into reverse is readily audible). While not everything the victim mutters during this time can be heard, the victim can be heard muttering to himself between seconds 34 and 37, "I'm going to fucking run into you – I'm going to run into you" as he is backing up multiple car lengths. It does not appear Harris can hear these mutterings although whether he can hear is not completely clear from the video.

The victim then stops and immediately starts going forward – it is open to debate and interpretation whether the victim was aiming his car at Harris or the parking spot. Harris jumps away and across the front of the victim's car into a parking space and the victim stops before fully entering that space. After the victim stops his car, Harris proceeds around the front of car and disappears from the camera's view. The car then goes briefly into reverse and then forward down the

4

roadway for a few feet.  At this point the video ends.  As described below, it is alleged that Harris cut the victim's throat when the victim was stopped near the parking stall but that is not discernible on the video (either by sounds or by the victim exclaiming as much).

A third video, introduced into evidence as People's Exhibit 3 but not played in open court, is of the victim driving a bit further forward, stopping his car, and calling 911.  The victim states to the 911 operator that a "guy" cut his throat and that the person was still there "standing right next" to him.  Nothing can be heard from Harris or any individuals other than the victim and 911 operator.  Harris cannot be seen at any point during this video though at the very end of the video Harris' companion can be viewed on the left walking with the shopping cart.

*Victim's Testimony*

On the day in question, the victim drove his car to a park to take his dog for a walk.  As he entered the park, he saw two men in the roadway move to the left so cars could pass them.  As he drove past the men, Harris threw a rock at the left rear of the victim's car.  The victim stopped his car, with his foot on the brake, opened the driver's side door, and yelled at Harris, " 'What the fuck are you doing?' "  In response, Harris walked toward the victim; Harris "seemed to be gleeful about the whole thing in that kind of an odd, grinning smile."

The victim was "terrified" and tried to close and lock his car door.  There was a "tussle" with the car door: the victim (sitting in the driver's seat) pulled at the car door to close it, and Harris grabbed at the window frame, pulling it back toward him.  There was no physical contact between the men.  The "tussle" lasted "seconds;" at some point

5

Harris told the victim, three times, " 'You're gonna die,' " in an angry, aggressive, voice.[3]  The victim felt threatened, like he was going to die, and "[a]bsolutely" believed Harris might carry out his threats. Speaking in a very aggressive voice, Harris also told the victim not to call the cops and if he did so he was going to die.  The victim felt very threatened and was concerned for his safety.  On cross-examination the victim confirmed he did not believe Harris would cause him significant harm if he called 911 but the victim was scared as he did not know what harm would come his way.  Additionally, while the victim did not really believe Harris would kill him if he called the police as the victim did not know how Harris would kill him "other than sort of slitting my throat, which was as close to death I think as I've been."

After a few seconds, the victim was able to get his car door closed. Harris did not say anything further to the victim.[4]  Harris then moved "around to the right side of [the victim's] car.  [The victim thought] he did.  He was on the right side.  [The victim] wanted to pull into the parking place."  The victim later testified that at some point after he had closed his car door, he began to drive away from where Harris was because he "just wanted to get away to lessen the fear of the threat." When asked at what point he began driving his car toward Harris, the victim said after the tussle with the car door frame and Harris made "the threat of death" and "the threat about [the victim] reporting a crime."  At some point the victim started to drive his car toward Harris

---

[3]     The victim testified that before Harris threatened him, he had never threatened Harris and had not said he was going to physically harm Harris in any way.

[4]     When asked if at this time in the interaction Harris said, " 'Okay. The fight's over.  I'm done,' " the victim replied: "No.  There was no closure in the interaction."

with the goal of pulling into a parking space. When asked if he intended to hit Harris, the victim said he did not know, he could not imagine thinking or being able to do so, and he may have been trying to frighten Harris as the victim did not have "a lot of ammo in my arsenal."

When asked "at the point where you accelerated or started driving in the direction of the Harris, why didn't you just leave instead of doing that?," the victim replied that he did not know and could not say "because the confrontation was ongoing. There was a conclusion to it, not that I was looking for any, but I don't know. I wasn't trying to win." At the time the victim drove toward Harris, the victim felt Harris was still a threat to his life "[b]ecause of the conversation that he had with me and the words he said" and the victim had no idea what Harris could do.

The victim also testified that as he "was pulling forward" toward Harris, Harris "was dancing around" or "hopped around" from the right side of the car to directly in front of the car; the victim braked his car because he did not want to hit Harris. Harris then ran "around the front" of the car to the driver's side; he "was gleeful again; that happy, crazy look in his face." Harris's expression terrified the victim. Harris reached into the rear window of the driver's side (the victim did not know the window was down) and Harris cut the victim on his neck. The victim initially did not feel any pain and believed Harris had scratched his neck with a sharp fingernail. The victim later realized he was bleeding from a cut on his neck; there was blood everywhere, on his shirt, pants, and shoes.

7

After People's Exhibit 2 (second video) was played, the prosecutor asked the victim a series of questions, eliciting what the victim heard and saw as the prosecutor replayed and stopped the video at certain second marks. The victim was asked if he heard on a portion of the video when "you say something about hitting Harris with this car?," the victim replied: "I said to myself, 'I'm going to run into him.'" The victim testified he did not believe Harris heard him make that statement because the stereo was playing and the car windows were up except for the back rear window – the video supports this recounting. The victim testified that 46 seconds into the video clip was the point when he got cut and had put his car "in reverse . . . [and] was getting ready to back out and go down the street." The victim confirmed that "from this video it looks like [he] had braked [his] vehicle, reversed, and six seconds later is when [he] would have been slashed."

Harris withdrew his hand from inside the car and followed the victim as the victim drove his car forward four or five feet while calling the police. The recording of the 911 call was played for the jury. When sirens could be heard in the distance, Harris walked out of the park. In response to the 911 call, emergency services transported the victim to a hospital where he received over 20 stitches to close a four-inch cut on his neck. The wound healed but left a scar.

On cross-examination, the victim was asked if it was his "testimony today that you did not try to hit Mr. Harris with your car?" The victim responded, "I didn't try to hit him with my car. I drove towards him, yes." Defense counsel then asked, "So when you said something in your car, 'I'm going to run him over,' you did not mean that?" and the victim responded, "That was my only – I said that

8

because it was my only personal defense, and by that time I was enraged."

After being shown a video of statements he made to the police at the hospital, the victim confirmed he had told the police that he had "accelerated to try and kill him;" that he was "going to run him down with my car next time I see him;" that he was "going to accidentally hit the accelerator instead of the brakes;" that he felt some type of fear when Harris said something about the victim dying; and that Harris had said, " 'If you call the police, I will kill you,' " so the victim immediately called the police. The victim did not recall making his statements; he was shocked at what he said, and he attributed his statements to being on Fentanyl for pain and recalled feeling "high" when he spoke with the officer. The victim also recalled testifying that he intended to frighten Harris when he moved his car toward him and that he could have instead driven forward and left the park. The victim also testified that he had told the prosecutor that he was trying to scare Harris.

*Additional Testimony*

A bystander witness saw Harris as he left the park after the incident. He described Harris as "aggressive but happy at the same time," and as Harris walked past the bystander, the bystander heard Harris say, " 'I like competition.' "

Shortly after the incident, a police officer was dispatched to a gas station (about two miles from the park) in response to a report that Harris was in front of a gas station challenging other individuals to a fight. The officer saw Harris in front of the gas station and asked him if he had a weapon. Harris removed from his pocket an X-ACTO box

9

cutter and placed it on the ground. The box cutter did not have a blade, but it was covered with dried blood where the blade would have been inserted into the box cutter handle.

*Prior Offense Evidence*

A BART peace officer testified about an altercation or disagreement at a BART station that occurred the evening of December 28, 2020. The officer and his partner found Harris "very agitated and confrontational, very verbally aggressive." After Harris was arrested for resisting arrest and placed in a patrol car, he told one officer that the officer was going to die, Harris was going to kill him, and the officer was lucky Harris did not kill him at that point in time. Harris's voice tone was very loud, and he was agitated, frustrated, and angry. On several occasions throughout Harris's contact initially with the officers and after Harris was placed in the patrol car, Harris asked one or the other officer to fight him.

## DISCUSSION

The trial court did not give an instruction allowing the jury to consider convicting Harris of attempted voluntary manslaughter based on heat of passion, a lesser included offense of attempted murder. It refused the proposed instruction on the basis there was "no evidence of heat of passion." We agree with Harris that the failure to provide the instruction was prejudicial error.

### I. Heat of Passion Theory of Attempted Voluntary Manslaughter

Harris was charged with attempted murder, which requires "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citation.] Attempted murder requires express malice, that is, the assailant either desires the

10

victim's death, or knows to a substantial certainty that the victim's death will occur." (*People v. Booker* (2011) 51 Cal.4th 141, 177–178.)

However, an attempt to kill while acting "in the heat of passion – even if exercising a sufficient 'measure of thought . . . to form . . . an intent to kill' – [results in] 'a mental state that precludes the formation of malice.' " (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1136–1137 (*Millbrook*), quoting *People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*); see § 192, subd. (a) ["[m]anslaughter is the unlawful killing of a human being without malice;" "[i]t is of three kinds: (a) Voluntary – upon a sudden quarrel or heat of passion"].) Simply put, heat of passion reduces " 'an intentional, unlawful killing from murder to voluntary manslaughter "by negating the element of malice that otherwise adheres in such a homicide." ' " (*People v. Schuller* (2023) __ Cal.5th __ [2023 Cal. Lexis 4520 at p.*21] (*Schuller*), quoting *People v. Rios* (2000) 23 Cal.4th 450, 461, quoting *People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*)[5]; see *People v Van Ronk* (1985) 171 Cal.App.3d 818, 824–825 (*Van Ronk*) ["[t]here is nothing illogical or absurd in a finding that a person who unsuccessfully attempted to kill another did so with the intent to kill which was formed in a heat of passion;" "[u]nder those circumstances, the less culpable person is guilty of attempted voluntary manslaughter rather than attempted murder"].)

Heat of passion is "a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*Beltran, supra,* 56

---

[5]     *Breverman* was disapproved on another ground in *Schuller, supra,* __ Cal.5th __ [2023 Cal. Lexis 4520 at p.*36, fn. 7].

Cal.4th at p. 942.) This theory of manslaughter has both an objective and a subjective component. To satisfy the objective, also known as "reasonable person," element, heat of passion must be due to verbal or physical provocation that would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. To satisfy the subjective element, the defendant must have acted under the actual influence of the provocation. " ' "However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter." ' " (*People v. Moye* (2009) 47 Cal.4th 537, 549–550 (*Moye*).)

"[O]n appeal we employ a de novo standard of review and independently determine whether an instruction on the lesser included offense of [attempted voluntary manslaughter based on the heat of passion theory] should have been given." (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.) In so doing, we view the evidence in the light most favorable to the defendant, we do not evaluate the credibility of the witnesses, and we may find substantial evidence "even in the face of inconsistencies presented by the defense itself." (*Breverman, supra,* 19 Cal.4th at pp. 162–163; see *People v. Barton* (1995) 12 Cal.4th 186, 196 (*Barton*) [a "jury's truth-ascertainment function" is impaired unless it is given "the opportunity to decide whether the defendant is guilty of a lesser included offense established by the evidence"]; *id.* at p. 203 [" '[t]he jury should not be constrained by the fact that the prosecution and defense have chosen to focus on certain theories;' " "[t]he trial court must instruct on lesser included offenses when there is substantial

evidence to support the instruction, regardless of the theories of the case proffered by the parties"].)

II.     *Verdict is not Inconsistent with Heat of Passion Jury Instruction*

Despite the Attorney General's contentions to the contrary, there is nothing in the jury verdict inconsistent with an instruction based on heat of passion. Although the jury must have found Harris intended to kill (a prerequisite for a conviction of attempted murder), that finding does not rule out the possibility that he acted in the heat of passion. (See *Beltran, supra,* 56 Cal.4th at p. 942; see *Von Ronk, supra,* 171 Cal.App.3d at pp. 824–825 [nothing illogical or absurd in a finding that a person who unsuccessfully attempted to kill another did so with the intent to kill which was formed in a heat of passion].)

This possibility was also not ruled out by the jury's rejection of the two self-defense theories, reasonable or imperfect self-defense, upon which it was instructed. Indeed, " 'in the usual case,' " a heat-of-passion instruction " 'supplements the self-defense instruction,' " in that " 'even though the defense of self-defense fails, as it might for excessive retaliation by the defendant, the jury might still find the original [provocation] sufficient to constitute [heat of passion], which would preclude a finding of malice aforethought and reduce the crime to manslaughter.' " (*People v. St. Martin* (1970) 1 Cal.3d 524, 530–531; see *Breverman, supra,* 19 Cal.4th at pp. 148, 162–164 [trial court erred in not giving heat-of-passion instruction where jury was instructed on both theories of self-defense]*; Barton, supra,* 12 Cal.4th at pp. 202–203 [sufficient evidence supported giving both heat-of-passion and imperfect self-defense instructions]; *People v. Thomas* (2013) 218

13

Cal.App.4th 630, 634-635, 639, 645 (*Thomas*) [while evidence might fit better with imperfect self-defense, trial court erred by not giving heat-of-passion instruction where defendant had a heated argument with victim and victim's friends, one of the friends punched defendant, defendant went to his car to retrieve a gun, defendant's father tried to calm him down, and when victim then approached defendant, defendant shot victim believing victim was trying to get the rifle].)

III.     *Heat of Passion Instruction was Warranted*

An instruction on heat of passion is warranted where there is substantial evidence to support the requisite objective and subjective components: (1) the defendant's passion was due to a legally sufficient provocation by the victim that would cause an ordinary person of average disposition to act rashly and without deliberation and reflection; and (2) the defendant acted while under the actual influence of a strong passion induced by adequate provocation. (See *Millbrook*, supra, 122 Cal.App.4th at p. 1139.) "No specific type of provocation is required, and 'the passion aroused need not be anger or rage, but can be any " ' "[v]iolent, intense, high-wrought or enthusiastic emotion" ' " [citations] other than revenge.' " (*People v. Lasko* (2000) 23 Cal.4th 101, 108.) " 'However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the [attempted] killing is not [attempted] voluntary manslaughter.' " (*Breverman, supra*, 19 Cal.4th at p. 163; see *People v. Gingell* (1931) 211 Cal. 532, 545 ["the 'cooling time' to be considered [i]s the time within which an ordinarily reasonable [person] would cool under like circumstances"].)

14

We find there was substantial evidence to support the instruction's objective component – a legally sufficient provocative act. The evidence shows that immediately before Harris cut the victim's neck the victim had backed up and then nearly hit Harris with his car. The victim had no barrier to simply continuing to drive away (rather than backing up) and his testimony of being "terrified" is belied by the decision not to drive away. A jury might not have ultimately been convinced that Harris acted in the heat of passion, but the evidence would allow it to find that after the initial encounter it was the victim who provoked Harris by backing up his car and driving it toward Harris.

We find unavailing the Attorney General's argument that the victim's act of driving his car toward Harris at most arose to the level of "simple assault" and hence was not sufficient to arouse the passions of an ordinarily reasonable person to cause an attempt at the victim's life. "[T]here is no way that driving a car toward a person can constitute simple assault but not assault with a deadly weapon or force likely to cause great bodily injury." (*People v. Golde* (2008) 163 Cal.App.4th 101, 117.) Further, the Attorney General's argument – which is focused on whether an ordinary person of average disposition would be moved *to attempt to kill the victim* "focuses on the wrong thing. The proper focus is placed on [Harris's] state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way,

15

provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Beltran*, *supra*, 56 Cal.4th at p. 949.)

We also find there was substantial evidence to support the instruction's subjective component – that Harris acted under heat of passion caused by the victim's provocative act. "As . . . explained in *People v. Jones* (1911) 160 Cal. 358, 368 . . ., 'it is not a matter of law but a matter of fact for the jury in each case to determine under the circumstances of the case whether the assault or whether the blow, or whether the indignity or whether the affront, or whatever the act may be, was such as is naturally calculated to arouse the passions and so lessen the degree of the offense by relieving it from the element of malice.' " (*Beltran*, *supra*, 56 Cal.4th at pp. 950–951.) While the jury concluded Harris did not have an actual fear that he was in imminent danger of death or great bodily injury, under proper instructions it could have found Harris acted rashly and without reflection in reaction to the victim's driving his car at him, which was preceded by an exchange of aggressive words between Harris and the victim. (See *Thomas*, *supra*, 218 Cal.App.4th at p. 645 [although facts might fit more precisely with a homicide mitigated by imperfect self-defense, a heat of passion instruction was appropriate where evidence supported that defendant shot the victim when his passion was aroused and his reason was obscured due to a sudden quarrel].)

Moreover, the Attorney General does not address whether sufficient time elapsed for a reasonable person's passion to " 'cool off' " and for reason or judgment to be restored. (*Beltran*, *supra*, 56 Cal.4th

16

at p. 951.)  It cannot be said as a matter of law that a few seconds (the time between the car going toward Harris and the criminal act) was a sufficient cooling off period for a reasonably ordinary person's passion to subside and reason or judgment restored.  While Harris's facial appearance and statement after the incident is circumstantial evidence of his earlier state of mind it does not refute as a matter of law a claim that he was acting under a heat of passion.  A rational jury could find that under the circumstances faced by Harris, a reasonable person's "intense and high-wrought emotions aroused by the initial threat" of the victim's conduct had not had time to cool or subside before acting rashly and without reflection.  (*Breverman, supra*, 19 Cal.4th at p. 164.)

IV.    *Failure to Instruct was Prejudicial Error*

We conclude the trial court's refusal to instruct on heat of passion was not harmless under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).  (See *Schuller, supra*, ___ Cal.5th __ [2023 Cal. Lexis 4520 at p.*36, fn. 7] [when the record contains substantial evidence of heat of passion, the failure to instruct on that theory is subject to review under the *Chapman* standard].)  As the court explained in *Schuller*, " '[a] jury misinstruction that relieves the prosecution of its burden to prove an element of the crime – by either misdescribing the element or omitting it entirely – violates [the federal Constitution].' [Citations.]  When [heat of passion] is at issue, the malice element of murder requires the People to show the absence of that circumstance beyond a reasonable doubt. [Citation.]  Thus, when there is substantial evidence to support the theory, the failure to instruct on [heat of passion] amounts to an incomplete element of murder, namely malice.  In the absence of such an instruction, jurors

17

would have no reason to conclude they cannot find malice (and thus cannot return a verdict of murder) if they harbor a reasonable doubt as to whether the defendant [acted in heat of passion].  Because this form of misinstruction precludes the jury from making a finding on a factual issue that is necessary to establish the element of malice, it qualifies as federal error." (*Schuller, supra,* __ Cal.5th __ [2023 Cal. Lexis 4520 at pp.\*\*3-4].)

Having found the trial court here erred in refusing to instruct the jury on heat of passion, under *Chapman*, we make " 'a thorough examination of the record.' " (*Schuller, supra,* __ Cal.5th __ [2023 Cal. Lexis 4520 at p.\*39], quoting *Neder v. United States* (1999) 527 U.S. 1, 19 (*Neder*).)  "Unless, based on this examination, we conclude 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained,' we reverse the conviction." (*People v. Brown* (2023) 14 Cal.5th 453, 473, quoting *Chapman, supra,* 386 U.S. at p. 24, and citing *Neder*, at p. 15.)

Here, our examination of the record shows sufficient (but not overwhelming) evidence to support the attempted murder charge, but, as we have also determined, there was sufficient evidence to support an instruction on heat of passion.  Because, as discussed at length *ante,* a reasonable jury could have concluded Harris acted pursuant to heat of passion and therefore lacked the requisite malice for an attempted murder conviction, we cannot conclude " 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*Brown*, at p. 473; see *Schuller, supra,* __ Cal.5th ___ [2023 Cal. Lexis 4520 at pp.\*42-43] [if the appellate court believes an instruction on imperfect self-defense was warranted because there was

18

sufficient evidence from which a reasonable jury could find in defendant's favor on question of imperfect self-defense, "the court could not then, consistent with *Chapman*, go on to find that the error was nevertheless harmless simply because the evidence against imperfect self-defense was so overwhelming that no reasonable jury could have possibly found in [defendant's] favor on that issue"].)

The Attorney General's reliance on *Moye, supra*, 47 Cal.4th 537, to argue harmless error is misplaced as the Supreme Court's decision is premised on the facts before it in that case, facts that do not align with those in the case before us. In *Moye*, "[o]nce the jury rejected defendant's claims of reasonable and imperfect self-defense, there was little if any independent evidence remaining to support [the defendant's] further claim that he killed in the heat of passion, and no direct testimonial evidence from defendant himself to support an inference that he *subjectively* harbored such strong passion, or acted rashly or impulsively while under its influence for reasons unrelated to his perceived need for self-defense." (*Moye, supra*, 47 Cal.4th at p. 557.) The court in *Millbrook* explained as follows: "The only evidence supporting a heat-of-passion instruction in *Moye* was the defendant's own testimony that he acted in self-defense. Thus, in rejecting the self-defense argument, the jury in *Moye* necessarily rejected the only evidence that would have supported a heat-of-passion instruction. . . . *Moye* does not hold that a failure to instruct on heat of passion can never be prejudicial when a jury rejects a finding of self-defense, and neither will we." (*Millbrook, supra*, 222 Cal.App.4th at p. 1148.)

As always, we must analyze the facts in the case before us. Unlike in *Moye*, the jury here did not necessarily reject all evidence

19

supporting a heat of passion instruction by refusing to find that Harris acted in unreasonable self-defense. The standard for unreasonable self-defense is whether the defendant had an honest but unreasonable belief that they were in "imminent danger of being killed or suffering great bodily injury" (CALCRIM No. 571), not whether their reason was obscured by passion that negated malice. While the evidence concerning Harris's state of mind was relevant to both unreasonable self-defense and heat of passion, the jury might well have concluded that while Harris was not in fear of his life or suffering great bodily injury, nonetheless he acted in a heat of passion when he cut the victim's neck. Harris was entitled to have the jury " 'consider the full range of possible verdicts' included in the charge. . . . [E]very lesser included offense, or theory thereof, which is supported by the evidence must be presented to the jury." (*Breverman*, *supra*,19 Cal.4th at p. 155; italics omitted.) Even though the jury was allowed to consider whether Harris acted in imperfect self-defense, "nothing in the court's instructions advised the jury it could consider whether [Harris's] passion was aroused or his reason obscured on account of" the victim's conduct in driving his car toward Harris. (*Thomas*, *supra*, 218 Cal.App.4th at p. 646.)

In sum, for the reasons stated, the conviction for attempted murder cannot stand as we cannot say, beyond a reasonable doubt, that the omission of a heat-of-passion instruction did not affect the jury's verdict.[6]

<hr>

[6] We recognize that in their briefs, filed before our Supreme Court's opinion in *Schuller*, the parties agreed the proper standard of review was under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). Given the *Schuller* opinion, we do not employ the *Watson* standard of

20

## V.     Remedy

" 'An appellate court is not restricted to the remedies of affirming or reversing a judgment.  Where the prejudicial error goes only to the degree of the offense for which the defendant was convicted, the appellate court may reduce the conviction to a lesser degree and affirm the judgment as modified, thereby obviating the necessity for a retrial.' " (*People v. Edwards* (1985) 39 Cal.3d 107, 118 (*Edwards*).)

Harris does not challenge the sufficiency of the evidence to support the jury's implicit finding that he harbored the intent to kill the victim, and concedes the People are entitled to retry him on that charge should they so choose.  Harris asks us to offer the People the alternative option of accepting a modification to the judgment to reflect Harris's conviction for attempted voluntary manslaughter, thereby obviating the need for a retrial.  The People have not responded to this request in their brief.

The People are entitled to retry Harris, or they may be satisfied with a conviction of attempted voluntary manslaughter.  Because we do not know whether the People would prefer to retry Harris or would be satisfied with a conviction of attempted voluntary manslaughter, our

---

review.  We note that if *Watson* were applicable, we would conclude reversal was required because there is " ' "a *reasonable chance*, more than an *abstract possibility*" ' " that the jury would have come to a different verdict had the court given a heat-of-passion instruction. (*Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050; see *Millbrook*, *supra*, 222 Cal.App.4th at pp. 1146–1147 [defendant shot a fellow guest at a house party during a heated exchange; the court found prejudicial error under *Watson* in failing to give a heat of passion instruction where evidence conflicted as to what prompted the defendant to shoot the victim and as to the defendant's state of mind when he fired the shot].)

disposition preserves both opinions.  (See *Edwards*, *supra*, 39 Cal.3d at p. 118.)

## DISPOSITION

Harris's convictions for elder abuse, assault with a deadly or dangerous weapon (and related enhancement), dissuasion of a witness, and criminal threats are affirmed.

The conviction for attempted murder is reversed.  The People shall have 60 days from issuance of the remittitur to refile an attempted murder charge.  If the People do not do so, the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction of attempted voluntary manslaughter and shall resentence Harris accordingly.  At any resentencing hearing for attempted voluntary manslaughter on the modified judgment, the trial court shall consider the enhancements for personal use of a deadly or dangerous weapon and personal infliction of great bodily injury on a person 70 years of age or older as alleged in the information and proven at trial.

_____
Petrou, J.

WE CONCUR:


_____
Fujisaki, Acting P.J.


_____
Rodríguez, J.

A164007/*People v. Harris*